UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
JULIE L. LONGOBARDI,                    :

                  Plaintiff,     :          **REPORT &**
                                            **RECOMMENDATION**
                  - v. -         :
                                            07 Civ. 5952 (LAP)(MHD)
MICHAEL J. ASTRUE,
Commissioner of Social Security,  :

                  Defendant.     :
----------------------------------x

**TO THE HONORABLE LORETTA A. PRESKA, U.S.D.J.:**


        Plaintiff Julie L. Longobardi filed this action pursuant to

the Social Security Act, 42 U.S.C. § 405(g). She seeks review of an

October 23, 2006 determination by the Commissioner of the Social

Security Administration (the "Commissioner" and the "SSA,"

respectively) denying her application for disability insurance

benefits under the Social Security Act (the "Act") based on a

finding that she was "not disabled."


        The Commissioner has moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Plaintiff has moved for equivalent relief. Plaintiff seeks an

order: (1) reversing the Commissioner's determination that she was

"not disabled" on or about April 25, 2002; and (2) remanding the

case solely for the calculation of benefits retroactive to that

date or, in the alternative, remanding the case for further

consideration.

For the reasons set forth below, we recommend that the case be remanded for further consideration and administrative proceedings, and that in all other respects both parties' motions be denied.

**PROCEDURAL HISTORY**

On September 30, 2004,[1] Longobardi filed an application for disability insurance benefits,[2] alleging that she had become disabled on April 25, 2002 as a result of "Lyme disease with

---

[1] Plaintiff filed a different application form (also for disability insurance benefits)dated October 23, 2004, alleging the same disability onset date, but did not include the specific illnesses, injuries, or conditions that limit her ability to work. (Tr. 42-50). The Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") refers to October 20, 2004 as the date of plaintiff's application for disability insurance benefits (Def. Mem. 1); however, the Plaintiff's Memorandum of Law ("Pl. Mem.") refers to September 30th as the pertinent date. (Pl. Mem. 1). The ALJ's determination refers to October 20, 2004 as the date upon which Longobardi applied for disability benefits. (Tr. 13).

[2] On April 7, 2003, Longobardi also applied for disability benefits from New York State and Local Employees' Retirement System, but her application was denied on August 3, 2004.(Tr. 70, 211). The Director of Disability Processing stated "that the applicant is not permanently incapacitated for the performance of duties. It is hereby determined and directed that the application for Article 15 Disability Retirement be and the same is hereby disapproved." (Tr. 211).

multiple symptoms; arthritis, [and] vertigo."[3] (Administrative Record Transcript ("Tr.") 38-41). The SSA denied her application initially on January 14, 2005, finding that she was not disabled under SSA rules. (Tr. 23-26). Specifically, the SSA determined that the medical evidence showed that Longobardi had "pain," but that she was "able to move about freely," and that her "stabilized" condition did not prevent her from working as a social worker. (Tr. 26). In February 2005, plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 27). The ALJ, Thomas P. Zolezzi, considered her case de novo at a hearing on September 12, 2006 via video teleconference. (Tr. 32-35, 303-38).

On October 23, 2006, the ALJ found that plaintiff was not disabled, as defined by the Act. (Tr. 10-21). He found that while plaintiff could not perform her past relevant work, she could perform a "full range of sedentary work." (Tr. 20-21). On December 26, 2006, plaintiff filed a request for review with the SSA Office of Hearings and Appeals. (Tr. 6-9). Plaintiff's request for review

---

[3] Lyme disease is defined as "a recurrent, multi-systemic order caused by *Borrelia burgdorferi*, having the tick *Ixodes dammini* as the vector. It begins in most cases with erythema chronicum migrans (at least 5 cm in diameter), followed by a variety of highly variable manifestations, including myalgia, arthritis of the large joints, and involvement of the nervous and cardiovascular system." Dorland's Illustrated Medical Dictionary, 485 (28th ed. 1994) (hereinafter, "Dorland's"). Vertigo is defined as "an illusory sense that either the environment or one's own body is revolving[.]" Dorland's at 1820.

and remand was denied on April 20, 2007. (Tr. 3-5).

On June 22, 2007, having exhausted all her administrative remedies, Longobardi filed a complaint in this Court seeking review of the ALJ's October 23, 2006 determination. She alleges: 1) that she has been under a disability since April 25, 2002, and that she continues to be under such disability; and 2) that she provided proof of her ongoing disability and the ALJ's adverse decision was not supported by substantial evidence in the record. (Compl. ¶ 4). Plaintiff seeks an order setting aside the ALJ's and Appeals Council's decisions, and awarding her disability insurance benefits.

The Commissioner has moved for judgment on the pleadings, contending that there was substantial evidence to support the challenged decisions. (See generally Def.'s Mem.). In response, plaintiff filed a cross-motion, alleging that: 1) the ALJ's finding of residual functional capacity (hereinafter, "RFC") was incorrect and improperly determined; and 2) Longobardi's RFC should have been determined to be for "less than sedentary work," thus compelling a finding of disability. (Pl.'s Mem. at 7-13).

# **FACTUAL BACKGROUND**

## I. Testimonial Evidence

Plaintiff Longobardi appeared with legal representation for a hearing before ALJ Zolezzi on September 12, 2006 via video-conference.[4] (Tr. 303-38). Longobardi was born on August 16, 1962. (Tr. 75, 307-09). She can read, speak and understand English. (Tr. 58). She completed a Master's Degree in Social Work in 1986 at Adelphi University in Long Island, New York. (Tr. 307).

Longobardi lives with her husband, Brian Longobardi. (Tr. 75, 309). From July 1986 to April 2002, she worked eight hours per day, five days per week, as a social worker. (Tr. 59). She was an intake coordinator for New York State in Dutchess and Putnam Counties. (Tr. 310). Her volume of cases was between fifty and seventy-five at a time (Tr. 311), and for a period of time she was also a supervisor, whose responsibilities included hiring and firing employees.(Tr. 67, 311). Longobardi testified that while at work, she had to carry files, and open and close file drawers. (Tr. 312). In addition, she reported that she had to walk four hours each day, sit four hours

---

[4] Plaintiff was at one location while the ALJ was at another location. Both parties were able to see, hear and speak to each other using a large color television screen. The ALJ was also able to see, hear and speak to anyone who went with plaintiff to the hearing. (Tr. 32).

each day, reach four hours each day, and write, type or handle small objects for the whole day. (Tr. 67). She also testified that her job was "high stress" because she worked with families who were under a "lot of stress[.]" (Tr. 312).

According to Longobardi, she became disabled and stopped working as a social worker in April 2002 because of complications and symptoms from Lyme Disease, arthritis, fatigue, and pain.[5] (Tr. 59, 312-13). Furthermore, she reported that her "brain fog" and her difficulty concentrating and writing summary reports limited her ability to work. (Tr. 58-59). Prior to leaving work as a social worker completely, she started working fewer hours, required her own office to cut down on noise and regulate temperature, used sick time, and took frequent breaks. (Tr. 59, 66).

At her administrative hearing, she testified that about six weeks prior to the hearing (i.e., August 1, 2006), she had started working part-time at a clothing boutique. (Tr. 313). She now works about twelve to fifteen hours per week, earning $7.50 to $8.00 per hour. (Tr. 314). Her responsibilities generally include greeting customers, answering questions, ringing up sales, and occasionally

---

[5] Her covered earnings in 2002 were $38,313.71, and her covered earnings in 2003 were $12,302.56 (Tr. 51). The money earned after April 2002, however, came from accumulated vacation, sick leave, and half of the year's pay. (Tr. 314).

ordering inventory. (Tr. 335-36).

With respect to Longobardi's daily activities, she reported that she typically gets up, has breakfast, cleans her cats' litter box, washes dishes, does laundry, checks e-mail, sometimes goes to the gym, stops at the store to pick up dinner, has lunch, naps, gardens, prepares dinner, watches TV, and bathes before bed around 9:00 pm.[6] (Tr. 76, 330). She also helps her husband with his business by taking messages, banking, running errands, and bookkeeping. (Tr. 76, 337). She reported, however, that she is unable to maintain energy for a full day, feels confused at times, is unable to focus when tired, and needs to take naps. (Tr. 326-28, 331-33).

Longobardi also testified that because of her arthritis, it is very difficult for her to grasp objects and open jars or bottles. (Tr. 80, 324-25). She described her arthritis pain as "sometimes a burning, sometimes a continuous" pain in her hands, wrists, elbows, feet, ankles and knees. (Tr. 309). Plaintiff stated that around February 2001, her arms were in a permanently bent position with many nodules on her hands, wrists, fingers, elbows and ankles. (Tr. 313, 317-18). With respect to her hands and wrists, plaintiff testified that she has difficulties grasping or holding things in both her left

---

[6] Plaintiff reported her what her daily activities are in a New York State Office of Temporary and Disability Assistance Division of Disability Determination Function Report. (Tr. 76).

and right hands. (Tr. 324).

Longobardi testified that she also sometimes has trouble with the stairs in her two-story home. (Tr. 309). In addition, she testified that holding the steering wheel of her car is sometimes uncomfortable, although she also said that she had driven to the hearing herself. (Tr. 309-10). Her "fine motor" is very sensitive, and she experiences hand cramping if she tries to do an activity with her hands for more than fifteen to twenty minutes. (Tr. 325). Her joint pain also causes her disturbed sleep. (Tr. 76). She is able to grocery shop, but her husband helps put heavy items away. (Tr. 325-26). When cooking, she is able to peel vegetables, but not well, and she therefore uses frozen and prepared vegetables. (Tr. 326). Although she is able to put pots on the stove, or a chicken in the oven, these activities cause her a lot of pain. (Id.). When it comes to cleaning, vacuuming, dusting and gardening, plaintiff testified that she does a "little bit" every day so that she does not have to use her hands all day. (Tr. 327). Otherwise, they become sore and cramp up for several days afterward. (Id.).

Plaintiff reported that she was put on Embrel in 2004 for her rheumatoid arthritis, and injects herself with it once a week. (Tr. 317, 322). She testified that before she started the injections, her arms were bent, but that after about two injections, she was able to

straighten them. (Tr. 317-18). When asked about Embrel's side effects, plaintiff testified that she experiences dizziness and headaches that last anywhere from a few hours to the entire day. (Tr. 322). Plaintiff also testified that she takes Advil. (Id.).

When the ALJ asked how plaintiff's conditions affect her physical abilities, plaintiff stated that she is able to walk or stand for about one-half hour before the balls of her feet start burning and her toes and ankles start aching and she needs to rest or put her feet up because they start to hurt. (Tr. 80-81, 322-23). To relieve this pain, she has to sit down and massage her feet for a time period varying from a few minutes to a few hours, but even then she is able to walk for only about another ten minutes before her feet start to hurt again. (Tr. 81, 323). She testified that because her toes are "off to the side", she experiences a lot of pressure on her big toes and the balls of her feet. (Tr. 336). Plaintiff stated that she is able to sit for about thirty to forty-five minutes before she has to change positions because her hips start to hurt. (Tr. 324). Because of this pain, plaintiff testified that there were days when her household chores took a "back burner" to how she was feeling. (Tr. 337).

Longobardi's social activities include going out to dinner, watching movies or plays, e-mailing, and talking on the phone. (Tr.

80, 327-28). She also likes to read biographies and inspirational books, but sometimes has difficulty recalling parts or telling someone about it. (Tr. 329-30). She reported that she spends several hours a week engaging in these activities, but if she has plans in the evening, she has to take a nap or rest beforehand. (Tr. 327-28). She also belongs to All Sport fitness club, which she goes to regularly to stretch, use the elliptical machine, swim or do yoga. (Tr. 328). She does not drink alcohol, smoke, or use illegal drugs.[7] (Tr. 332).

Longobardi is able to care for her personal needs, but she reported she has difficulty removing a coat or jacket, and needs assistance removing clothes pulled over her head (e.g., a sweatshirt or sweater). (Tr. 76-77, 94, 331). Also, she reported that if she gardens or vacuums for too long, she has difficulty using her hands to grasp a hairbrush or toothbrush. (Tr. 331).

Longobardi also testified that her physical problems are less intense in the morning or right after a nap. (Tr. 332). As her day progresses, her grip and foot problems increase, and her cognitive problems are at their worst in the afternoon. (Tr. 332-33). She stated, therefore, that she always goes to the gym in the morning.

---

[7] Longobardi reported to Dr. Anita Shulman that she started drinking beer and wine when she was 17 years old, but she stopped 12 years ago (Tr. 98).

(Tr. 333).

## II. Medical Evidence

### A. Treating Sources

Plaintiff began seeing Dr. Michael Compain of Rhinebeck Health Center in 1994. (Tr. 102). After an absence of several years, she resumed regular treatment with him in June 2003 for chronic Lyme disease and secondary rheumatoid arthritis. (Tr. 68, 91, 102, 296). Dr. Compain provided two letters about the status of plaintiff's conditions (Tr. 102-03, 114), progress notes from June 2, 2003 to January 4, 2006 (Tr. 170-80, 206-09), lab reports dated October 22, 2004 (Tr. 236-41), and a Physical Functional Capacity Assessment dated September 7, 2006. (Tr. 296-302).

When plaintiff began treatment with Dr. Compain in 1994,[8] she presented with fatigue, arthralgia,[9] joint inflammation and cognitive dysfunction. (Tr. 102). In addition, one of plaintiff's examinations

_____

[8] Dr. Compain wrote in a letter dated November 8, 2004, that Longobardi had been seen in his office since 1994 (Tr. 102). However, Longobardi reported on her "Disability Report - Adult - Form SSA - 3368" that her first visit with Dr. Compain was in June, 2003 (Tr. 61).

[9] Arthralgia is defined as "pain in a joint." Dorland's at 140.

performed at St. Claire's Hospital showed joint inflammation,[10] and her labs showed anemia, and a positive Western Blot to Lyme Disease. (Id.). Plaintiff's chronic Lyme disease had originally been diagnosed around 1992,[11] but it went untreated for about two years.[12] (Tr. 124). She was finally treated with antibiotics and showed some improvement, but her symptoms continued to return. (Id.). Plaintiff's medications from Dr. Compain include Ceftin for Lyme Disease,[13] Nystatin for a fungus infection and Vioxx for arthritis. (Tr. 62).

After an absence for several years, plaintiff returned to Dr. Compain's office on June 2, 2003, having been treated previously with antibiotics for a variety of tick-borne infections, as well as having undergone a course of Methotrexate and Prednisone for rheumatoid arthritis.[14](Tr. 102). On that occasion, her symptoms included brain

_____

[10] In Dr. Compain's letter dated November 8, 2004, he makes no mention of what type of examination was performed that showed inflammation of the joints. (Tr. 102). This examination also does not appear to be a part of the administrative record.

[11] No records indicate who diagnosed plaintiff with Lyme Disease in 1992.

[12] No explanation is provided as to why her Lyme Disease went untreated for two years.

[13] Plaintiff indicated she experienced gastrointestinal irritation as a side effect of Ceftin. (Tr. 62).

[14] Rheumatoid arthritis is defined as "a chronic systemic disease primarily of the joints... marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones." Dorland's at 140.

fog, insomnia, fatigue, tinnitus,[15] disequilibrium, and light and sound sensitivity. (Tr. 206). Dr. Compain reported that plaintiff suffered from arthritis of her upper extremities, which had first been diagnosed in the early 1990s, with a positive polymerase chain reaction ("PCR") and positive SPECT scan.[16] (Id.). Dr. Compain also noted joint swelling and nodules on her joints and ligaments. (Id.). Other progress notes from 2003 indicated low energy and high brain fog, especially in the afternoon. (Tr. 209).

Dr. Compain's next progress notes on record are dated September 27, 2004. At that visit, plaintiff indicated that, while she felt less brain fog over the past two weeks, she did experience depression when she felt the fog, and she was still fatigued in the afternoon. (Tr. 170). She also continued to experience arthralgia, but with some

---

[15] Tinnitus is defined as "a noise in the ears, such as ringing, buzzing, roaring or clicking." Dorland's at 1714.

[16] Polymerase chain reaction ("PCR") is "[a] fast, inexpensive technique for making an unlimited number of copies of any piece of DNA." National Human Genome Research Institute, National Institutes of Health, Talking Glossary, http://www.genome.gov/glossary.cfm?key=polymerase%20chain%reactio n%20PCR (last visited July 16, 2008).
SPECT, defined as "single photon emission computed tomography," Dorland's at 1551, is "a sensitive diagnostic tool used to detect stress fracture, spondylosis, infection (e.g. discitis), and tumor (e.g. osteoid osteoma). Analyzing blood flow to an organ (e.g. bone) may help to determine how well it is functioning." See Susan Spinasanta, Nuclear Imaging: SPECT Scans and PET Scans, http://www.spineuniverse.com/displayarticle.php/article328.html (last visited July 16, 2008).

improvement in her neck. (Id.).

At Dr. Compain's request, lab tests for Lyme disease and rheumatoid arthritis were performed on October 18, 2004, and reported on October 22, 2004. (Tr. 236-39). These labs reported Lyme Antibody ELISA results of 1.52,[17] which were positive, while her Lyme IgM and IgG Western Blot interpretations were negative.[18] (Tr. 236-37). Plaintiff's labs of the same date indicated that her Rheumatoid Arthritis factor was 29.2 IU/ml, which was above the normal range. (Tr. 238). Finally, plaintiff's sedimentation rate was 30 mm/hr, which was also interpreted as high, since the normal range for a woman of her age (under 50) is 0-20 mm/hour.[19] (Tr. 238).

---

[17] An ELISA screening test is an "[e]nzyme immunoassay (EIA) screening test to detect the presence of IgM and/or IgG antibodies against *Borrelia burgdorferi*." See Michigan Department of Community Health Bureau of Laboratories, Lyme Borreliosis IgG/IgM Antibody EIA, http://www.michigan.gov/documents/LSGLyme_Borreliosis_Antibody_IgM_and_IgG_Test_8272_7.doc (last visited July 23, 2008).

[18] According to the lab report, the CDC advised at the time of plaintiff's testing that Western blot testing be performed following all equivocal or positive EIA results. Furthermore, the CDC considered an equivocal or positive EIA result followed by a negative Western blot result to be negative. (Tr. 236-37).

[19] Sedimentation rate is a "non-specific screening test that indirectly measures how much inflammation is in the body." The normal result for women under 50 is less than 20mm/hour. See U.S. National Library of Medicine & National Institutes of Health, ESR, in Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003638.htm (last visited July 16, 2008).

On October 27, 2004, Dr. Compain wrote a letter reporting that plaintiff's major symptoms were fatigue, cognitive dysfunction with difficulty with concentration and word retrieval, myalgias, arthralgias, sensory sensitivity and ringing in the ears, and episodes of depressed effect. (Tr. 114). According to Dr. Compain, plaintiff's symptoms, including her cognitive dysfunction, seriously impaired her "ability to function as a social worker, in that her job require[d] the energy and mental focus to deal with people who have significant emotional needs over the course of a 40 work week." (Id.). Therefore, in his opinion, plaintiff's medical condition precluded her from functioning effectively in her work capacity. (Id.). Dr. Compain also indicated that it was unlikely that her medical condition would improve significantly in the foreseeable future. (Id.).

A subsequent letter from Dr. Compain, dated November 8, 2004, indicated that during the past year or two, plaintiff had had progressive problems with fatigue and cognitive dysfunction as well as joint pain, and had developed deformities of the metacarpophalangeal joints in both hands.[20] (Tr. 102). Furthermore, Dr. Compain indicated that her labs showed a positive ELISA result

---

[20] Metacarpophalangeal is defined as, "pertaining to the metacarpus and phalanges." Dorland's at 1020. The metacarpus is "the part of the hand between the wrist and the fingers, its skeleton being five cylindric bones (metacarpals) extending from the carpus to the phalanges." Id.

for Lyme disease, though her results were equivocal for Western Blot. (Tr. 102-03). He also reported that plaintiff's sedimentation rate was generally in the 40-50 mm/hour range, and her Rheumatoid Arthritis Factor had been negative.[21] (Tr. 103). Dr. Compain's impression of plaintiff's condition was chronic Lyme disease with autoimmunity and rheumatoid arthritis. (Id.).

The doctor saw plaintiff again on November 24, 2004. On that occasion, he reported that plaintiff's Lyme disease tests were negative, and that she was on Embrel for her rheumatoid arthritis. (Tr. 172). His notes indicate that plaintiff experienced "some straightening of [her] arms," and improved range of motion in her hands. (Id.). However, she was still experiencing some achiness in the afternoon. (Id.).

Dr. Compain's progress notes from March 21, 2005 indicated that plaintiff felt "beat up," agitated, woozy and fatigued, that she was experiencing tinnitus, and that her hair was thinning and her nails were breaking. (Tr. 173). Her arthritis was reportedly "fine," and

---

[21] Rheumatoid factor is "an antibody that attaches to a substance in the body called immunoglobulin G (IgG), forming a molecule known as an immune complex. The immune complex can trigger different types of inflammation-related processes in the body." U.S. National Library of Medicine & National Institutes of Health, Rheumatoid Factor, in Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003548.htm (last visited July 23, 2008).

she had experienced decreased buzzing and disequilibrium the past three days, but had also experienced increased noise sensitivity. (Id.). Dr. Compain reported that she was "tolerating" Embrel better. (Tr. 175).[22]

A visit to Dr. Compain on April 12, 2005 indicated that plaintiff felt "slightly better" and less "run down," but had some increased arthralgia in the past month. (Tr. 176). On July 12, 2005, Dr. Compain noted that plaintiff's hair and nails were better, and her arthritis was "stable" on Embrel. (Id.).

On November 9, 2005, Dr. Compain reported that over the past two weeks, plaintiff had a lower mood, and had been feeling apathetic. (Tr. 177). He also noted plaintiff's arthralgia, tinnitus, "buzzing" sensation, balance problems, cognitive dysfunction, and tiredness, and that plaintiff had had an outpatient surgery for endometriosis. (Id.). Plaintiff was still on Embrel, but her joints continued to swell. (Tr. 178). A Lyme Immunoblot test dated November 15, 2005 reported that while there was some IgM and IgG band reactivity, the results did not reach the criteria for a positive Western Blot. (Tr. 182). According to the report, a Western Blot containing specific

---

[22] This statement appears in an undated entry on the upper half of a page of Dr. Compain's progress notes that also includes an entry on the lower half of the page for a July 12, 2005 visit. (Tr. 175)

bands but not meeting the positive criteria specified by the CDC was considered "indeterminate" by the New York State Department of Health. (Id.).

A few weeks later, on November 30, 2005, plaintiff was resting more and felt better, but she still had tinnitus and other symptoms, though less intense. (Tr. 179). Dr. Compain noted that she was still not back to her "baseline." (Id.). Plaintiff's "hardest time" was between 1:00 pm and 4:00 pm, she was sleeping only around six hours per night, and her sleep was "lighter." (Id.). Her brain fog was reportedly better, but she still felt moderately "low." (Id.).

On September 7, 2006, Dr. Compain completed a Physical Functional Capacity Assessment form for plaintiff. (Tr. 296-302). He reported plaintiff's diagnoses as rheumatoid arthritis, Lyme disease and dysmenorrhea.[23] (Tr. 296). Dr. Compain cited as the clinical findings and objective signs supporting his diagnosis plaintiff's positive rheumatoid arthritis factor, high sedimentation rate, and positive Lyme ELISA result. (Id.). He reported that plaintiff suffered from daily arthralgia pain in numerous joints and was capable of only low-stress jobs. (Tr. 296-99).[24] Dr. Compain reached

---

[23] Dysmenorrhea is defined as "painful menstruation." Dorland's at 516.

[24] The record is missing pages 297 and 298.

this conclusion because "any significant physical activity above part-time exacerbates" plaintiff's condition. (Tr. 299).

As a result of plaintiff's impairments, Dr. Compain also opined that she could: 1) sit for one half-hour to one hour; 2) stand for up to one half-hour; and 3) walk for one half-hour. (<u>Id.</u>). In a total eight-hour workday, plaintiff could sit and stand/walk a total of four hours. (<u>Id.</u>). In addition, every two days, she would need unscheduled breaks for about thirty minutes. (<u>Id.</u>). Plaintiff would also sometimes need to lie down or rest at unpredictable intervals around twice a week. (Tr. 300).

While Dr. Compain reported plaintiff could "occasionally" lift or carry zero to five pounds in a competitive work situation,[25] he indicated that plaintiff could "rarely/never" lift or carry anything heavier.[26] (Tr. 300). Plaintiff also had "significant limitations" with repetitive reaching, handling or fingering. (<u>Id.</u>). According to Dr. Compain, during an eight-hour workday, plaintiff could use her

---

[25] "Occasionally" is defined by the Physical Functional Capacity Assessment as "less than one-third of an eight hour day." (Tr. 300).

[26] "Rarely/never" is defined by the Physical Functional Capacity Assessment as "no sustained period in an eight hour day." (Tr. 300).

hands, fingers, and arms only ten percent of the time.[27] (Id.).

Dr. Compain reported that plaintiff had no significant limitations moving her neck. (Id.). However, he indicated that plaintiff could only occasionally perform: 1) forward flexion; 2) backward flexion; 3) rotation right; and 4) rotation left. (Tr. 301). Furthermore, plaintiff could only bend or twist her body downward and forward at the waist twenty percent of the time during an eight-hour workday. (Id.). As a result of plaintiff's impairments and treatments, Dr. Compain estimated that she would have to be absent from work more than three times a month. (Id.). Finally, Dr. Compain indicated that plaintiff's ability to work on a sustained basis was also affected by her need to: 1) avoid temperature extremes; 2) avoid humidity; 3) avoid bright lights; and 4) avoid noise. (Tr. 302).

In addition to plaintiff's treatment by Dr. Compain, from around 2000, during her absence from Dr. Compain's office, she was treated by Dr. Horowitz for Lyme disease. (Tr. 206). Dr. Horowitz submitted lab reports from 2001 (Tr. 204, 212), and a status letter, dated April 2, 2003, about plaintiff's condition while she was a patient at the Hudson Valley Healing Arts Center. (Tr. 205).

---

[27] For hands, fingers and arms, the ten percent figure applies to both that right and left sides. (Tr. 300).

The test results, dated March 22, 2001, indicated a positive Lyme disease PCR. (Tr. 204). A brain SPECT also showed mild to moderate heterogeneity and decreased perfusion in the cortices, with evidence of white matter disease. (Tr. 212). According to the attending radiologist, these findings were "compatible with vasculitis or encephalitis, such as that seen in Lyme disease."[28] (Id.).

According to Dr. Horowitz's letter dated April 2, 2003, plaintiff was diagnosed with Lyme disease, Babesia,[29] and Mycoplasma.[30] (Tr. 205). Her symptoms included fevers, sweats, chills, severe fatigue, swollen glands, shortness of breath, joint stiffness and swelling, sensitivity to light, tinnitus, sound sensitivity, poor balance, lightheadedness, confusion, difficulty thinking and writing, reversing of letters and numbers, and problems with memory and concentration. (Id.). He further opined that "at this point in her

---

[28] Vasculitis is "inflammation of a vessel[,]" Dorland's at 1797, and encephalities is "inflammation of the brain." Dorland's at 548.

[29] Babesia is defined as "a genus of hematozoan protozoa... occurring as single or paired intraerythrocytic parasites of various vertebrates, causing diseases in domestic and wild animals and humans and transmitted by ticks[.]" Dorland's at 171.

[30] Mycoplasma infection is a "respiratory illness caused by *Mycoplasma pneumoniae*, a microscopic organism related to bacteria." See New York State Department of Health, Mycoplasma Infection (walking pneumonia, atypical pneumonia), http://www.health.state.ny.us/diseases/communicable/mycoplasma/fact_sheet.htm (last visited July 23, 2008).

treatment, she is unable to work and needs monthly follow up medical attention." (Id.).

Dr. Misha Kucherov, an internist and neurologist, examined plaintiff twice, according to the administrative record. (Tr. 115-16, 118-19). In addition, Dr. Kucherov submitted lab reports dated from June 3, 2004 to June 23, 2004. (Tr. 117, 276-82).

On June 1, 2004 (Tr. 118), Dr. Kucherov noted plaintiff had clubbing, cyanosis and edema in her extremities,[31] and that the motor function in her elbows and shoulders was 5/5, and 4+/4+ in her fingers. (Tr. 119). Based on that examination, Dr. Kucherov's impression was "episodic vertigo." (Id.). On June 3, 2004, a lab report indicated plaintiff's sedimentation rate was 54, which was high. (Tr. 276). Plaintiff's Lyme result was 1.51, which was also high and positive. (Tr. 192). However, tests for Lyme Western Blot IgG and IgM both came back as "indeterminate."(Tr. 193). On June 11, 2004, Dr. Kucherov also ordered a Magnetic Resonance Imaging ("MRI"), which showed multiple non-specific T2 hyper-intensities in the

---

[31] Clubbing is "a proliferative change in the soft tissues about the terminal phalanges of the fingers or toes." Dorland's at 344. Cyanosis is "a bluish discoloration, applied especially to such discoloration of skin and mucus membranes due to excessive concentration of reduced hemoglobin in the blood." Dorland's at 411. Edema is "the presence of abnormally large amounts of fluid in the intracellular tissue spaces of the body; usually applied to demonstrable accumulation of excessive fluid in the subcutaneous tissues." Dorland's at 528.

periventricular white matter.[32] (Tr. 117). The MRI report indicated that "these findings may be consistent with the patient's history of Lyme disease." (Id.).

Dr. Kucherov's next examination of plaintiff on record took place on June 14, 2004. (Tr. 115). Plaintiff complained of episodes of buzzing, vertigo all day, flu-like symptoms, feelings of sea-sickness, and joint and back pain. (Id.). Dr. Kucherov's impression was chronic Lyme disease, vertigo, and giant cell arteritis.[33] (Tr. 116).

An audiological and electronstagmography ("ENG") test followed on June 23, 2004. (Tr. 203). This test revealed that plaintiff's hearing was within normal limits, and that she had normal speech reception and excellent word recognition ability. (Id.).

Plaintiff has also been seen Dr. Andrea Gaito, a rheumatologist

---

[32] Periventricular is defined as "around a ventricle." Dorland's at 1265. The ventricles of the brain are "the cavities within the brain which are filled with cerebrospinal fluid[.]" Dorland's at 1815.

[33] Giant cell arteritis is defined as "a chronic vascular disease of unknown origin, most common in the carotid arterial system but also occurring in other large and small systemic arteries, characterized by proliferative inflammation, often with giant cells and granulomas, and by headache, pain with chewing, weakness, weight loss, and fever, with a markedly increased erythrocyte sedimentation rate." Dorland's at 130.

and Lyme disease specialist. Dr. Gaito submitted X-rays of plaintiff's hands, feet, wrists and ankles dated October 18, 2004 (Tr. 222-29), lab reports dated January 31, 2005 (Tr. 234-35), September 13, 2005 (Tr. 232-33), and November 14, 2005 (Tr. 230-31), as well as an Arthritis Functional Capacity Assessment dated September 8, 2006 (Tr. 288-94), and undated progress notes. (Tr. 259-67).

Plaintiff's hand X-rays ordered by Dr. Gaito showed: 1) cystic lesions in the first through fourth metacarpal bones and in the bases of the second, third and fourth proximal phalanges of the left hand; 2) severe cystic deforming lesions of the heads of the first, second and third metacarpals and small cystic lesions in the bases of the first, second and third proximal phalanges of the right hand; 3) narrowing of the joint spaces; and 4) more apparent cystic destructive changes to the styloid process and distal ulna. (Tr. 223). The reading doctor's impression was "extensive bilateral cystic lesions compatible with inflammatory arthritic process including rheumatoid arthritis." (Id.).

The X-rays of plaintiff's feet showed: 1) cystic lesions in the heads of the first through fifth metatarsal bones of the right foot, and in the bases of the proximal phalanges of the first through fourth toes; 2) more advanced cystic lesions in the heads of the

first through the fifth metatarsal bones and the basis of the first through the fourth phalanges of the left foot; 3) the second DIP joint was narrowed with "most destructive changes present." (Tr. 224). The reading doctors' impression was "inflammatory arthritic process demonstrated in both feet compatible with rheumatoid arthritis." (Id.).

X-rays of plaintiff's wrists also showed cystic lesions in the phalanges and metacarpal bones. (Tr. 225). The reading doctor's impression was "bilateral distal radius and ulna cystic bone lesions." (Id.). Plaintiff's ankle X-rays also showed cystic changes in the right ankle. (Tr. 229).

Labs ordered by Dr. Gaito dated February 1, 2005 reported a sedimentation rate of 6 mm/hour, and a Rheumatoid factor of 30.9 IU/ml, which was high. (Tr. 234). Labs reported on November 14, 2005 indicated a sedimentation rate of 8 mm/hour, and a Rheumatoid factor of 24 IU/ml, which was also high. (Tr. 231).

On September 8, 2006, Dr. Gaito completed an Arthritis Functional Capacity Assessment of plaintiff in which she diagnosed plaintiff with rheumatoid arthritis. (Tr. 288-94). Dr. Gaito cited

synovitis,[34] metacarpophalangeal joint deformities, and a positive Rheumatoid factor as the clinical findings and objective signs supporting her diagnosis. (Tr. 288). Dr. Gaito also identified pain and fatigue as the symptoms from which plaintiff suffers. (Id.). According to Dr. Gaito, plaintiff's pain took the form of a continuous, moderate dull ache in her shoulders, elbows, knees, and hands, which was precipitated by repetitive motions. (Tr. 288-89).

Dr. Gaito noted that plaintiff experienced: 1) joint warmth; 2) joint deformity; 3) joint instability; 4) reduced grip strength; 5) tenderness; 6) redness; 7) swelling; 8) muscle weakness; and 9) muscle atrophy in her hands, wrists, knees and elbows. (Tr. 289). While Dr. Gaito indicated that plaintiff's symptoms were severe enough to interfere with her attention and concentration, she stated that it was "impossible to predict" how often that would happen. (Tr. 290). However, Dr. Gaito did report that plaintiff was able to tolerate only "low-stress jobs." (Id.).

---

[34] Synovitis is defined as "inflammation of a synovial membrane. It is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." Dorland's at 1645. Around each joint is a capsule lined with synovial tissue, which produces synovial fluid. National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Instites of Health, Handout on Health: Rheumatoid Arthritis, http://www.niams.nih.gov/Health_Info/Rheumatic_Disease/default.as p (last visited July 29, 2008). Synovial fluid, in turn, lubricates and nourishes joint tissue. Id. In patients with rheumatoid arthritis, the synovium becomes inflamed, which results in damages to the cartilage and bones of the joint. Id.

As a result of plaintiff's impairments, Dr. Gaito also opined that at any one time, she could: 1) sit for two hours; 2) stand for one hour to two hours; and 3) walk for one-half hour to one hour. (Tr. 291). In a total eight-hour workday, plaintiff could sit and stand/walk for four hours. (Id.) In addition, however, plaintiff would need unscheduled breaks, but Dr. Gaito was unable to predict how often. (Id.). In Dr. Gaito's opinion, plaintiff would not need to lie down or rest at unpredictable intervals. (Id.).

Dr. Gaito reported that plaintiff could "occasionally" lift and carry up to ten pounds, but could "rarely/never" carry anything heavier. (Tr. 292). Furthermore, plaintiff had "significant limitations" with repetitive reaching, handling or fingering. (Id.). According to Dr. Gaito, plaintiff could use her: 1) hands twenty percent of the time; 2) fingers five percent of the time; and 3) arms one percent of the time. (Id.).

Dr. Gaito indicated that plaintiff had no significant limitations moving her neck. (Tr. 293). However, Dr. Gaito did report that plaintiff could only "occasionally" perform: 1) forward flexion; 2) backward flexion; 3) rotation right; and 4) rotation left. (Id.). Furthermore, plaintiff could only bend or twist her body downward and forward at the waist twenty percent of the time during an eight-hour workday. (Id.). While Dr. Gaito opined that plaintiff's impairments

27

would likely produce "good days" and "bad days," she stated that it was "impossible to predict," on average, how often plaintiff would have to be absent from work. (Id.). Finally, Dr. Gaito did not find any other limitations that would affect plaintiff's ability to work on a sustained basis. (Tr. 294).

Apart from Dr. Gaito's reports, the administrative record contains unclearly dated progress notes of Dr. Gaito.[35] (Tr. 259-67). These notes reported that plaintiff was sluggish (Tr. 259), and noted her rheumatoid arthritis. (Id.). In addition, Dr. Gaito noted the medications that plaintiff was taking, which included Embrel 50mg, Tylenol and one other illegible name. (Tr. 260). Subsequent notes indicated plaintiff "can do a lot now," but that metacarpophalangeal joints were lagging, and her elbow was a little tight. (Tr. 261). The notes also reported plaintiff's hair loss and headaches. (Id.). Dr. Gaito further noted that plaintiff's arms were straightened out and that her grip strength was better. (Tr. 262).

Plaintiff had also been seen biweekly, since September 21, 2001,

---

[35] The number 11.06 appears on the first page of the progress notes, but whether that represents November 6 of some year, or November, 2006, is unclear. No other numbers of those sorts appear in the subsequent nine pages of progress notes. (Tr. 259-67).

by Dr. Dolores Projansky, a psychologist.[36] (Tr. 132). Dr. Projansky completed an evaluation of plaintiff for the New York State Office of Temporary Disability Assistance on January 16, 2005, and diagnosed her with dysthymia.[37] (Id.). Plaintiff's noted symptoms included chronic pain, neurological symptoms (memory loss, confusion, word retrieval difficulty, sensitivity to light and sound, dizziness), depression, anxiety, low self-esteem, sleep problems and loss of mobility. (Id.). Dr. Projansky reported that psychotherapy ameliorated some of plaintiff's symptoms. (Tr. 133). Plaintiff was cooperative, and conscientiously attended all scheduled appointments. (Id.). The report indicated that plaintiff's most difficult problems were the neurological symptoms consequent to her Lyme disease. (Id.). While plaintiff appeared depressed and sad, she exhibited no limitations of speech, thought, or perception other than the neurological symptoms resulting from her Lyme disease. (Tr. 134). Dr. Projansky reported that plaintiff: 1) was able to take care of her personal needs; 2) was severely limited in terms of cleaning the

_____

[36] However, according to Dr. Alex Gindes', Ph.D., Intelligence Evaluation dated December 12, 2004, plaintiff had been in psychological treatment with Dr. Projansky for approximately 15 years on and off. (Tr. 124).

[37] Dysthymia is defined as "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." Dorland's at 519.

house, shopping, and cooking; 3) was very easily tired; and 4) had trouble focusing and concentrating because the strain tired her. (Tr. 135). According to Dr. Projansky, plaintiff was "not able to work at this time due to medical limitations." (Id.).

On December 23, 2005, Dr. Projansky completed a Psychological and Mental Impairment Functional Capacity Assessment of plaintiff. (Tr. 214-19). According to Dr. Projansky's DSM-IV Multiaxial Evaluation, plaintiff's global assessment of functioning ("GAF") was 51, while her highest GAF the past year was 53.[38] (Id.). Dr. Projansky indicated that plaintiff's symptoms included: 1) poor memory; 2) sleep disturbance; 3) mood disturbance; 4) emotional liability; 5) recurrent panic attacks; 6) anhedonia or pervasive loss of interest; 7) feelings of guilt/worthlessness; 8) difficulty thinking and concentrating; 8) perceptual disturbances; 9) social withdrawal or isolation; 10) decreased energy; 11) obsessions or compulsions; and 12) generalized persistent anxiety. (Tr. 214).

_____According to Dr. Projansky's clinical findings, plaintiff's neurological symptoms, along with her depression and anxiety, demonstrate the severity of her mental impairments. (Tr. 215). In

---

[38] A GAF of 51 to 60 corresponds to "Moderate symptoms... or moderate difficulty in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32 (4th ed. 1994) ("DSM-IV").

30

addition, her mental symptoms impair her energy level and her ability to focus and maintain concentration. (Id.). Furthermore, plaintiff's medications caused her dizziness, fatigue, drowsiness, and headaches.[39] (Id.). Dr. Projansky also opined that plaintiff's impairments would cause her to be absent from work more than three times a month. (Tr. 216).

With respect to plaintiff's mental abilities and aptitude to do unskilled work, Dr. Projansky checked "Poor/None" for the plaintiff's abilities to: 1) maintain regular attendance and be punctual; 2) complete a normal workday and workweek without interruptions from psychologically based symptoms; 3) perform at a consistent pace without unreasonable rest periods; and 4) deal with normal work stress.[40] (Tr. 217). Dr. Projansky also reported that plaintiff's restrictions in her activities of daily living as a result of her mental impairments were "Marked."[41] (Tr. 218). Dr. Projansky opined

---

[39] Plaintiff was on 50 mg Embrel once a week, 7.5 mg Hydrocortisone in the mornings and 5.0 mg Hydrocortisone in the afternoons. (Tr. 215).

[40] "Poor/None" is defined by the Psychological/Mental Impairment Functional Capacity Assessment as "*complete* loss of ability to perform the named activity in regular, competitive employment *and* in a sheltered work setting; could do so only to meet basic needs at home." (Tr. 217)

[41] "Marked" is defined by the Psychological/Mental Impairment Functional Capacity Assessment as "more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to

that plaintiff had a moderate degree of difficulty in maintaining social functioning, and frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (Id.). Furthermore, Dr. Projansky reported that when at home, plaintiff may experience repeated episodes of deterioration or decompensation, which may cause her to withdraw from a situation or to experience exacerbation of symptoms. (Id.). When at work, plaintiff may experience such deterioration or decompensation continuously. (Id.).

Finally, Dr. Projansky indicated that plaintiff's ability to work on a sustained basis was also affected by her need to: 1) avoid humidity/dampness; 2) avoid noise; 3) avoid fumes; 4) avoid temperature extremes; 5) avoid dust; 6) avoid gases; and 7) avoid industrial lighting. (Tr. 219).

Since July 14, 2005, plaintiff was also being treated biweekly by Irene Humbach, a licensed clinical social worker and psychotherapist. (Tr. 269). Plaintiff was seeing Ms. Humbach for depression and anxiety related to her chronic pain, inflammation and over-sensitivity to many external stimulants resulting from years of chronic Lyme disease and rheumatoid arthritis. (Id.). In a letter

---

seriously interfere with the ability to function independently, appropriately and effectively."

dated April 14, 2006, Ms. Humbach indicated that the severity of plaintiff's physical symptoms had not decreased significantly, but that she was "learning techniques to release deeply held emotions, including despair and anxiety toward the extremely limiting nature of her illnesses." (Id.). In addition, as a result of neurological damage from Lyme disease, plaintiff had developed extreme sensitivity to stimulants such as ultraviolet and overhead lighting, noise and changes in temperature, which cause her to become distracted, irritable, unfocused and anxious. (Id.).

On April 14, 2006, Ms. Humbach completed a Psychological and Mental Impairment Functional Capacity Assessment of plaintiff. (Tr. 270-75). According to Ms. Humbach, plaintiff's signs and symptoms included: 1) occasional poor memory; 2) occasional sleep disturbance; 3) occasional recurrent panic attacks; 4) mild adhedonia or pervasive loss of interests; 5) feelings of guilt and worthlessness; 6) difficulty thinking or concentrating; and 7) decreased energy. (Tr. 270). Ms. Humbach opined that the Embrel 50 mg caused plaintiff dizziness that might interfere with her work. (Tr. 271). Furthermore, plaintiff's impairments and treatment would cause her to be absent from work more than three times a month. (Tr. 272).

With respect to plaintiff's mental abilities, Ms. Humbach checked "Good" for plaintiff's abilities to: 1) remember work-like

procedures; 2) sustain an ordinary routine without special supervision; and 3) make simple work-related decisions.[42] (Tr. 273). Ms. Humbach checked "Fair" for plaintiff's abilities to: 1) work in coordination with others; 2) perform at a consistent pace without an unreasonable number of rest periods; and 3) deal with normal work stress.[43] (Id.). Ms. Humbach checked "Poor/None" for plaintiff's abilities to: 1) maintain attention for two hours; 2) maintain regular attendance and be punctual; and 3) complete a normal workday and workweek without interruptions from psychologically based symptoms. (Id.).

Ms. Humbach also opined that plaintiff had slight difficulties maintaining social functioning, experienced frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and may experience one or two episodes of deterioration in work or work-like settings which cause her to withdraw or to experience exacerbation of signs and symptoms. (Tr. 274).

---

[42] "Good" is defined by the Psychological/Mental Impairment Functional Capacity Assessment as "*some* loss of ability to perform the named activity but still capable of performing it in regular competitive employment." (Tr. 273).

[43] "Fair" is defined by the Psychological/Mental Impairment Functional Capacity Assessment as "*substantial* loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special consideration and attention is provided." (Tr. 273).

34

Finally, Ms. Humbach indicated that plaintiff's ability to work on a sustained basis was also affected by her need to: 1) avoid wetness; 2) avoid humidity; 3) avoid noise; 4) avoid fumes; 5) avoid temperature extremes; 6) avoid gases; and 7) avoid overhead lighting.[44] (Tr. 275).

     B. <u>Consulting Medical Sources</u>

Dr. Anita Shulman conducted an Internal Medicine Examination of plaintiff on November 8, 2004 upon referral by the Division of Disability Determination. (Tr. 98-101). Plaintiff complained of her Lyme disease, flu symptoms, dizziness, arthritis-like symptoms in her hands and feet, and morning stiffness, as well as difficulty assimilating information. (Tr. 98).

Based upon her single session with plaintiff, Dr. Shulman reported that: 1) plaintiff appeared to be in no acute distress; 2) her gait was normal; 3) she was able to walk on heels and toes without difficulty; 4) her stance was normal; 5) she used no assistive devices; 6) she needed no help changing for exams or getting on and off the exam table; and 7) she was able to rise from a chair without difficulty. (Tr. 99). With respect to her

---

[44] Ms. Humbach also opined that plaintiff could manage benefits in her own best interest. (Tr. 275).

musculoskeletals, her cervical spine showed full flexion and full rotary movement bilaterally. (Tr. 100). She had full range of motion in her shoulder, elbows, forearms, wrists, hips, knees and ankles bilaterally, and had a negative Straight Leg Raise test. (Id.). Dr. Shulman also reported that plaintiff's joints were stable and displayed no tenderness, redness, heat, swelling or effusion. (Id.). No motor or sensory deficit was noted, and no muscle atrophy was evident. (Id.). Her hand and finger dexterity was reported as intact, with grip strength of 5/5 bilaterally. (Id.).

Dr. Shulman's mental status screen reported that plaintiff was oriented in all spheres. (Tr. 100). She displayed no evidence of hallucinations or delusions, no evidence of impaired judgment or significant memory impairment, and denied suicidal ideation. (Id.).

Dr. Shulman's diagnosis was Lyme disease and "status post infection." (Id.). While she offered a prognosis of "fair," she concluded that, "at this point in time, based on today's exam, there would be no restrictions." (Id.).

Dr. Alex Gindes, Ph.D., conducted an Intelligence Evaluation of plaintiff on December 14, 2004. (Tr. 124-27). Plaintiff complained of trouble sleeping, troubling images and thoughts, waking up once or twice a night from pain, diminished appetite, dysphoria and

fatigue, short-term memory deficits, concentration difficulties, and difficulties with organization and planning. (Tr. 125). Plaintiff, however, denied symptoms associated with anxiety disorder, bipolar disorder and formal thought disorder. (Id.).

Based on Dr. Gindes' behavioral observations of plaintiff, he determined that: 1) her hygiene was good; 2) her posture and motor behavior were normal; 3) her eye contact was appropriate; 4) her speech and language skills were adequate; 5) she was cooperative and friendly; 6) she was anxious initially, but became comfortable after a short time; 7) she recalled and understood instructions; 8) she responded in a deliberate and orderly self-correcting fashion; 9) she worked with reflection and deliberation; 10) her attention and concentration were good; and 11) she did not evidence significant emotional distress. (Id.).

Dr. Gindes administered a standardized achievement measure of reading, the Wide Range Achievement Test-III, which revealed plaintiff's grade equivalent as "Post-high school reading level." (Id.). In addition, as measured by the Wechsler Adult Intelligence Scale-III, a standardized intelligence measure, plaintiff's full scale IQ was 107. (Tr. 125-26). An analysis of the scaled scores suggested that plaintiff functioned intellectually predominantly

between the "average to above-average" range.[45] (Tr. 126).

Furthermore, her vocabulary and comprehension appeared to be in the "superior" range. (Id.). Plaintiff's general "fund of knowledge" and ability to pay attention to detail were in the "above-average" range. (Id.). Her short-term recall, arithmetic skills, visuomotor coordination skills, and rote were in the "average" range, while her ability to interact appropriately in social situations was diminished at a "low-average" range.[46] (Id.).

Dr. Gindes also conducted a psychiatric evaluation of plaintiff on December 14, 2004 (Tr. 128-31), and he indicated that plaintiff's affect and posture were tense, but she was appropriate in speech and thought. (Tr. 129). Plaintiff's mood was neutral, her sensorium was clear, and her attention and concentration were mildly impaired, but she was able to perform simple calculations. (Id.). Dr. Gindes reported that plaintiff's memory skills were mildly impaired, but her insight and judgment were both "good." (Tr. 130).

According to Dr. Gindes' medical source statement for both evaluations on December 14, 2004, plaintiff could understand simple

---

[45] However, Dr. Gindes reported that plaintiff seemed to be functioning at an "average" range of intellectual functioning overall. (Tr. 126).

[46] Rote is defined as "[m]emorization using routine or repetition without full comprehension." Webster's II New Riverside University Dictionary, 1020 (1994)

directions and instructions, perform simple tasks, maintain attention
and concentration, maintain a regular schedule, learn new tasks,
perform complex tasks, make appropriate decisions, relate adequately
to others, and appropriately deal with stress. (Tr. 126-27, 130).
Plaintiff's difficulties were caused by fatigue. (Tr. 127). Dr.
Gindes diagnosed plaintiff with adjustment disorder with depressed
mood and rheumatoid arthritis, secondary to chronic Lyme disease, and
concluded that plaintiff's psychiatric problems were not significant
enough to interfere with her ability to function on a daily basis.[47]
(Id.). Dr. Gindes offered a prognosis of "[g]ood, given the absence
of debilitating psychiatric symptoms." (Id.).

A Physical Residual Functional Capacity ("RFC") Assessment of
plaintiff was provided on January 14, 2005 by a disability
consultant, J. Stry (Tr. 139-44), who made his/her conclusions based
on "all evidence in file (clinical and laboratory findings; symptoms;
observations; lay evidence; reports of daily activities; etc)." (Tr.
139-44). According to Stry's evaluation of plaintiff's exertional
limitations, she can: 1) occasionally lift and/or carry fifty pounds[48]

---

[47] Dr. Gindes also opined that plaintiff would be able to
manage her own funds. (Tr. 127).

[48] Occasionally is defined on the form as "occurring from
very little up to one-third of an 8-hour workday (cumulative, not
continuous)." (Tr. 139).

(Tr. 140) 2) frequently lift and/or carry twenty-five pounds[49] (id.)

3) stand and/or walk for about six hours in an eight-hour day (id.);

and 4) sit for about six hours in an eight-hour day. (Id.). According

to Stry, plaintiff had no limitations with her ability to push and/or

pull. (Id.). While noting plaintiff's complaints of flu-like symptoms

and dizziness and stiffness in her hands, the consultant concluded

that everything was within normal limitations, including gait and

range of motion of all joints, and grip strength was 5/5, with

manipulative ability intact. (Id.). Stry reported no postural,

manipulative, visual or communicative limitations. (Tr. 140-42). The

only environmental limitations noted were for plaintiff to avoid

concentrated exposure to hazards such as machinery, heights, etc. due

to dizziness.[50] (Tr. 142). Furthermore, while Stry reported

plaintiff's complaints of difficulty using her hands, lifting,

squatting, and kneeling, the consultant opined that plaintiff's

statements were not credible because her physical examination was

within normal limitations. (Tr. 142).


      Finally, Stry compared his or her findings to those of Dr.

---

[49] Frequently is defined on the form as "occurring one-third
to two thirds of an 8 work day (cumulative, not continuous)."
(Tr. 139).

[50] By concluding that plaintiff had no other environmental
limitations, Stry opined that plaintiff had no limitations with
respect to: 1) extreme cold; 2) extreme heat; 3) wetness; 4)
humidity; 5) noise; 6) vibration; 7) fumes, odors, dusts, gases,
and poor ventilation. (Tr. 142).

Compain.[51] The consultant noted that Dr. Compain's statement that plaintiff's medical condition precluded her from functioning effectively was significantly different from Stry's own RFC findings. (Tr. 143.). Stry's explanation of this difference was that Dr. Compain provided no findings, and the objective findings support the RFC that Stry provided. (Id.).

    On January 20, 2005, Dr. Rita Petro, a state agency psychologist, performed a Mental Residual Functional Capacity Assessment evaluation of plaintiff. (Tr. 145-62). Dr. Petro opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 145). Otherwise, plaintiff was not significantly limited in this area. (Id.).

    With respect to sustained concentration and persistence, Dr. Petro indicated that plaintiff was moderately limited in her ability to: 1) complete a normal workday and workweek without interruptions from psychologically based symptoms; and 2) perform at a consistent pace without unreasonable rest periods. (Tr. 146). Otherwise, plaintiff was not significantly limited in this area. (Tr. 145-46). Dr. Petro also concluded that plaintiff had no limitations in any area of social interaction or adaptation (Id.).

_____

    [51] While the evaluation form asks the consultant to cite the treating source's name and statement date, Stry did not provide the statement date of Dr. Compain's finding. (Tr. 143).

On the Psychiatric Review Technique form, which Dr. Petro completed on January 20, 2005, she indicated that her "medical disposition," or opinion, was based on affective disorders. (Tr. 149). She opined that plaintiff's medically determinable impairment was adjustment disorder with depressed mood. (Tr. 152). With respect to plaintiff's functional limitations, according to Dr. Petro, plaintiff had: 1) a mild degree of restrictions to activities of daily living; 2) no difficulties with social functioning; and 3) a moderate degree of limitations with concentration, persistence or pace. (Tr. 159). She concluded, however, that there was insufficient evidence to determine the degree of plaintiff's repeated episodes of deterioration. (Id.).

## ADMINISTRATIVE PROCEEDINGS

## I. The ALJ's October 23, 2006 Decision

The ALJ first determined that the plaintiff met the insured-status requirements of the Act through December 31, 2008. (Tr. 15). Next, he found that plaintiff had not engaged in substantial gainful activity since April 25, 2002. (Id.). While he found that her

42

rheumatoid arthritis was a severe impairment,[52] he determined that it did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[53] (Id.).

The ALJ then proceeded to evaluate plaintiff's residual functional capacity to determine whether she could perform her past relevant work, or other work existing in the national economy. The ALJ concluded that plaintiff had the RFC to perform sedentary work.[54] (Id.). In doing so, the ALJ mentioned most of plaintiff's symptoms, and considered the extent to which her symptoms were reasonably consistent with the objective medical evidence and other evidence. (Tr. 16-20). It bears noting, however, that the ALJ failed to discuss

---

[52] The ALJ concluded that plaintiff's depression was not severe, her hearing was within normal limits, her word recognition was excellent in both ears and she had normal speech reception thresholds. (Tr. 15).

[53] "The third inquiry in the disability analysis is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). If claimant does not have a listed impairment, the Commissioner will move to the fourth step of the mandated five-step analysis to determine disability. Id.

[54] "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

the extent of plaintiff's depression and anxiety symptoms -- or other nonexertional limitations -- except for pointing out that "there was no evidence of clinical depression." (Tr. 20).

The ALJ first summarized plaintiff's testimonial evidence and found that plaintiff's medically determinable impairments could reasonably be expected to produce her reported symptoms,[55] but that her statements concerning their intensity, persistence and limiting effects were not entirely credible. (Tr. 16). For example, the ALJ found that while plaintiff reported cognitive problems, especially when under stress, she was also able to engage in a wide variety of daily activities. (Tr. 16-17). In addition, the ALJ concluded that since plaintiff has testified that her cognitive problems become worse at night, they would not interfere with her normal work hours. (Tr. 16).

With respect to his conclusion that plaintiff's RFC was compatible with a full range of sedentary work, the ALJ noted plaintiff's Lyme disease diagnosis in 1994, and the opinion of her treating physician Dr. Compain that she had chronic Lyme disease with autoimmunity, premature arthritis and disability secondary to

---

[55] For example, the ALJ noted plaintiff's symptoms of memory loss, confusion, and other cognitive problems, inability to stand, walk or sit for extended periods of time, hand cramping and pain in her feet due to nodules which add pressure. (Tr. 16).

cognitive dysfunction, fatigue, joint pain and deformity. (Tr. 17).
The ALJ also mentioned Dr. Compain's report in which he opined that
plaintiff's medical condition precluded her from functioning
effectively in her work capacity, and that she was unable to perform
a full range of sedentary work. (Tr. 18). The ALJ, however, declined
to give controlling weight to Dr. Compain's opinion because he
"provided no objective findings" and "his opinion apparently [was]
based on [plaintiff's] subjective complaints." (Tr. 18).

In so deciding, the ALJ first concluded, against Dr. Compain's
opinion, that plaintiff "has no cognitive dysfunction." (Id.). In
addition, the ALJ discounted Dr. Compain's opinion of plaintiff's
cognitive dysfunction by indicating that an intelligence evaluation
by Dr. Gindes "showed no evidence of cognitive dysfunction." (Tr.
17). The ALJ also discounted Dr. Compain's conclusion that plaintiff
was not able to perform a full range of sedentary work" because
plaintiff's "progress notes indicated that she "had improved range
of motion in her hands and upper extremities after being placed on
Embril; and her rheumatoid arthritis was stable." (Tr. 19). The ALJ
did not, however, indicate how much weight he ultimately accorded Dr.
Compain's opinion, or the reasons for that weight.

The ALJ also noted Dr. Gaito's Arthritic Functional Capacity
Assessment of plaintiff, and the reported symptoms, including joint

warmth, deformity, instability, tenderness, reduced grip strength, redness, swelling, and muscle weakness and atrophy. (Tr. 18). The ALJ then discounted this assessment, stating that it was not supported by Dr. Gaito's progress notes, although the notes to which the ALJ referred are actually Dr. Michael Compain's. (Id.). The ALJ then cited progress notes that indicated increased range of motion, "great" lab reports, and better joints and less "brain fog." (Tr. 18-19). Based on these notes, the ALJ discounted Dr. Gaito's opinion that plaintiff was not able to perform a full range of sedentary work. (Tr. 19). The ALJ, however, did not indicate what weight he ultimately accorded to Dr. Gaito's opinion, or the reasons for that weight.

The ALJ also considered plaintiff's examination by the State agency physician Dr. Anita Shulman, who opined that plaintiff had "no restrictions." (Tr. 18). The ALJ noted that Dr. Shulman's evaluation revealed plaintiff's normal gait and station, full range of motion in the cervical and lumbar spines, shoulders, elbows, forearms, hips, knees and ankles. (Id.). To further buttress his conclusion that Dr. Compain's and Dr. Gaito's opinions did not command controlling weight, the ALJ relied on Dr. Shulman's opinion that plaintiff had "no restrictions," that she had "no problems in walking and using [her] hands," and that plaintiff's "[h]and and finger dexterity were intact and grip strength was 5/5 bilaterally." (Tr. 19).

46

Therefore, the ALJ concluded that plaintiff's RFC for a "full range of sedentary work" was supported by the "limited objective findings on examination." (Id.). As noted, to reach this conclusion, the ALJ had to discount Dr. Compain's and Dr. Gaito's RFC assessments of plaintiff, both of which indicated that plaintiff was not able to perform a full range of sedentary work. (Id.). The ALJ also arrived at his conclusion by determining that plaintiff's acknowledged daily activities were "compatible with at least a full range of sedentary work as defined in the Regulations." (Id.).

With respect to plaintiff's psychological issues, the ALJ mentioned Dr. Dolores Projansky's evaluation of plaintiff and her dysthymia diagnosis. (Tr. 18). After noting Dr. Projansky's opinion that plaintiff was not able to work due to medical limitations, the ALJ stated that "Dolores Projansky, a psychologist, is not a medical physician; and therefore, her opinion is not given great weight." (Id.). Furthermore, although Dr. Projansky's report indicated that plaintiff's neurological symptoms included memory loss, confusion, word retrieval difficulties, as well as depression and anxiety, the ALJ found no medical evidence of record to support them. (Tr. 20). Instead, based on the plaintiff's ability to read, drive and use e-mail, the ALJ concluded that the plaintiff "did not have any significant problems with memory or confusion." (Id.). In addition, the ALJ found that Dr. Projansky's assessment of plaintiff was

"inconsistent" with the plaintiff's reported symptoms. (<u>Id.</u>). The ALJ cited plaintiff's abilities that Dr. Projansky found to be "unlimited/very good," yet gave "little or no weight" to her opinions on plaintiff's abilities that she found to be "poor/none." In dismissing the latter findings of Dr. Projansky, the ALJ relied on plaintiff's "acknowledged mental and physical activities, intelligence testing, and mental status examination by [Dr. Gindes]." (<u>Id.</u>). Specifically, the ALJ indicated that plaintiff "only had adjustment disorder with depressed mood" and that there "was no evidence of clinical depression." (<u>Id.</u>). As with Drs. Compain and Gaito, the ALJ also ultimately neglected to explicitly specify what weight he gave Dr. Projansky's opinion, or his reasons for that weight.

Proceeding along the disability analysis, the ALJ found that plaintiff was unable to perform any past relevant work as a social worker, which required walking for four hours during an eight-hour workday. (Tr. 20). With the burden shifting back to the SSA to show that there were other jobs that plaintiff could perform in the national economy consistent with her RFC, age (thirty-nine on her disability onset date), education and work experience, the ALJ reviewed the Medical-Vocational Guidelines, which direct a conclusion of "disabled" or "not disabled" depending on the plaintiff's RFC and vocational profile. (Tr. 21).

The ALJ used the Medical-Vocational Rules to determine that plaintiff had an RFC compatible with substantial gainful activity existing in significant numbers in the national economy. (Tr. 20-21) (citing 20 C.F.R. § 404.1560(c)). Specifically, the ALJ found that plaintiff "has the residual functional capacity to perform the full range of sedentary work," was a "younger individual,"[56] with a high school and college education and a Master's degree in Social Work, and that she was able to communicate in English. (Tr. 20-21). Therefore, a finding of "not disabled" was directed by the Medical Vocational Rule 201.28. (Tr. 21).

## II. <u>Appeals Council Decision</u>

Plaintiff sought review by the Appeals Council. (Tr. 6-9). In doing so, she maintained that the evidence before the ALJ supported "the finding of an ongoing and continuous period of disability and that the ALJ's errors... [made] his [adverse] conclusion... unsupportable." (Tr. 9). The Appeals Council denied plaintiff's request for review without discussion of the merits. (Tr. 3-5).

---

[56]A "younger individual" is defined as one between the ages of eighteen and forty-four. 20 C.F.R. § 404.1563.

III.  The Parties' Motions in this Court

The Commissioner filed a motion for judgment on the pleadings, seeking an order affirming the ALJ's decision. In his brief, he argues that substantial evidence of record supports the decision that plaintiff failed to demonstrate that she was disabled under the Act during the period at issue. (Def.'s Mem. 1, 16-26).

First, the Commissioner contends that substantial evidence supports the ALJ's finding that plaintiff had the RFC to do sedentary work. (Def.'s Mem. 17-20). Specifically, the Commissioner relies on Dr. Shulman's opinion and lack of clinical findings that plaintiff's rheumatoid arthritis restricted her ability to perform sedentary work. (Def.'s Mem. 17-18). Furthermore, the Commissioner argues that "plaintiff's alleged vertigo did not prevent her from engaging in a wide range of daily activities," or from "doing the minimal exertional demands of sedentary work." (Def.'s Mem. 18). The Commissioner also asserts that plaintiff's alleged mental impairments did not prevent her from working. (Id.). The Commissioner argues that the ALJ's finding in this regard is supported by Drs. Gindes' and Petro's assessments of plaintiff and plaintiff's wide range of daily activities. (Id.).

Second, the Commissioner argues that substantial evidence supports the ALJ's decision not to accord controlling weight to the

opinions of Drs. Compain, Gaito and Projansky. (Def.'s Mem. 20-23).
The Commissioner acknowledged that a treating source opinion is
entitled to controlling weight when it is "'well-supported by
medically acceptable clinical and laboratory diagnostic techniques
and is not inconsistent with other substantial evidence.'" (Def.'s
Mem. 20) (quoting 20 C.F.R. § 404. 1527(d)(2)). Notwithstanding, the
Commissioner maintains that the ALJ properly declined to afford
controlling weight to the opinions of Drs. Compain and Gaito because
they "were not well-supported by the record, and were inconsistent
with other substantial evidence of record, including plaintiff's own
statements." (Def.'s Mem. 21). Specifically, the Commissioner points
out that those doctors' opinions are contradicted by Dr. Shulman's
opinion that plaintiff had "no functional restrictions," objective
medical evidence of plaintiff's ranges of motion and grip strength,
and plaintiff's own testimonial evidence of her daily activities.
(Def.'s Mem. 21-22). With respect to Dr. Projansky's opinion that
plaintiff had poor or no ability to maintain regular attendance and
be punctual, the Commissioner asserts that her opinion contradicts
evidence that plaintiff "conscientiously attended all scheduled
appointments" with Dr. Projansky and Drs. Gindes' and Petro's
opinions that plaintiff could maintain a schedule. (Def.'s Mem. 22).
Therefore, according to the Commissioner, "the ALJ properly declined
to afford this assessment controlling weight." (Def.'s Mem. 23).

Third, the Commissioner argues that substantial evidence supports the ALJ's finding that plaintiff's subjective complaints were not credible. (Def.'s Mem. 24-25). Specifically, the Commissioner claims that "where the symptoms alleged suggest a greater restriction of function than can be demonstrated by objective evidence alone, the Commissioner considers other evidence, such as a claimant's statements, [and] daily activities... in assessing the claimant's credibility." (Def.'s Mem. 24) (citing 20 C.F.R. § 404.1529(c)(3)). Because of plaintiff's "very active and full schedule of daily activities," the Commissioner contends that substantial evidence supports the ALJ's conclusion that plaintiff's statements about her limitations "were not entirely credible." (Def.'s Mem. 24-25).

Finally, the Commissioner argues that substantial evidence supports the ALJ's finding that there were a significant number of jobs in the national economy that plaintiff could perform. (Def.'s Mem. 25-26). The Commissioner points out the ALJ's reliance on Medical-Vocational Rule 201.28, which supposedly directs a conclusion that a person such as plaintiff is not disabled. (Def.'s Mem. 25).

Plaintiff in turn filed her own motion for judgment on the pleadings, seeking a reversal of the Commissioner's decision and a remand solely for the calculation of benefits. (Pl.'s Mem. 13). In

her brief, plaintiff argues that the RFC found by the ALJ is incorrect and was arrived at improperly.

Plaintiff first asserts the ALJ failed to assess the level of severity of her condition, and only referred to progress notes indicating that her rheumatoid arthritis was stable without examining the level of severity at which it was stabilized. (Pl.'s Mem. 8). Second, plaintiff contends that the ALJ erred by analogizing plaintiff's daily activity level to an RFC level because "the ability to participate in routine activities does not equate with an RFC sufficient to sustain work and will not rebut statements of pain or impairment unless there is proof that the claimant is engaged in those activities for sustained periods of time comparable to those required to hold a job." (Pl.'s Mem. 9) (citing Polidoro v. Apfel, 1999 WL 203350, *8 (S.D.N.Y. April 12, 1999); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)).

Next, plaintiff argues that the ALJ erroneously discounted her lack of bilateral dexterity and misrepresented progress notes in the record. (Pl.'s Mem. 9). While plaintiff concedes that her testimony and medical evidence show improved range of motion in her arms and hands after using Embrel, she asserts that there is no evidence that she could sustain these physical activities for the requisite period of time to perform a full range of sedentary work. (Pl.'s Mem. 9-10).

In addition, she notes that no consultative exam was performed to evaluate the extent of plaintiff's bilateral dexterity after she had engaged in repetitive motion, arguing that "the only substantial evidence in the record are the Functional Capacity Assessments noting significant limitations in <u>sustaining</u> bilateral dexterity." (Pl.'s Mem. 10) (emphasis in original).

Plaintiff also argues that the ALJ erroneously stated that Dr. Compain did not provide objective findings to support his opinion. In addition, plaintiff maintains that the one-time examination by Dr. Shulman does not negate the consistent opinions of plaintiff's treating sources because, for example, Dr. Shulman's medical source statement is "essentially self-limiting" in that Dr. Shulman stated that "[plaintiff] has no restrictions at this point in time based on today's exam." (Pl.'s Mem. 10). Against that backdrop, plaintiff argues that "the ALJ committed reversible error in failing to give controlling weight" to her treating sources. (Pl.'s Mem. 11).

Plaintiff next argues the ALJ should have considered Irene Humbach's opinion. (<u>Id.</u>). While Ms. Humbach is not an "acceptable medical source" under the Social Security regulations, plaintiff maintains that she is considered to be an "other source." (<u>Id.</u>) (citing Social Security Regulations ("SSR") 06-03p (citing 20 C.F.R. § 404.1513(d))).

Plaintiff also argues that the ALJ erred in discrediting her complaints regarding pain, fatigue, weakness and decreased bilateral dexterity, which can all be attributed to her Lyme disease or to her rheumatoid arthritis. (Pl.'s Mem. 11-12). According to plaintiff, if the ALJ had properly evaluated all the other evidence of record, the only result that could be obtained would be an RFC of "less than sedentary." (Pl.'s Mem. 12-13).

In his reply memorandum, the Commissioner responds that the ALJ evaluated more than the stability of plaintiff's condition because he explicitly reviewed evidence showing that she was doing well. (Def.'s Reply Mem. 2-3). In addition, the Commissioner argues that the ALJ is permitted to consider plaintiff's activity level in assessing her RFC because the ALJ's decision is to be based on all medical evidence and "other evidence." (Id.) (citing 20 C.F.R. § 404. 1545(b)).

With respect to the ALJ discounting plaintiff's manual dexterity, the Commissioner notes that the record contains evidence showing that plaintiff's dexterity was "not as limited as the assessment given by her treating physicians[,]" and that Dr. Shulman's results are not inconsistent with the treating physician reports documenting improvements in the condition of plaintiff's joints. (Def.'s Reply Mem. 4-5). The Commissioner also argues that

there is objective evidence from the treating physicians indicating the presence of plaintiff's impairment, but the evidence does not provide support for the treating physicians' opinions as to the degree of her functional limitation, and hence, the ALJ correctly rejected the opinions of her treating physicians as unsupported by objective evidence. (Def.'s Reply Mem. 5-6).

Furthermore, the Commissioner responds that the ALJ was not required to rely on medical evidence from "other sources." (Def.'s Reply Mem. 6). Because Ms. Humbach is not an "acceptable medical source," the ALJ "may" choose to use that evidence to show severity of an impairment, but the decision whether or not to do so is within the ALJ's discretion. (Id.) (citing 20 C.F.R. 404.1513(d)). Finally, the Commissioner maintains that the ALJ's credibility finding with respect to plaintiff is supported by substantial evidence and is also well within his discretion. (Def.'s Rep. Mem. 6-7) (citing Mimms v. Sec'y of Health and Human Ser. [sic],[57] 750 F.2d 180, 186 (2d Cir. 1984)).

**DISCUSSION**

I. Standard of Review

When a plaintiff challenges the SSA's denial of disability

---

[57] The correct case citation is Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984).

insurance benefits, the court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Balsamo, 142 F.3d at 79 (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); 42 U.S.C. § 405(g) ("the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings but also to inferences and conclusions of law to be drawn from the facts. See, e.g., Carabello ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

As implied by the substantial-evidence standard, it is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the

plaintiff. Carroll, 705 F.2d at 642. While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); accord Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's opinion).

Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand a challenge if the ALJ committed legal error. Balsamo, 142 F.3d at 79. Of particular importance, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ has an affirmative obligation to fully develop the administrative record. Perez v. Chater, 77 F. 3d 41, 47 (2d Cir. 1996) (citing Echevarria v. Sect'y of Health and Human Serv., 685 F.2d 751, 755 (2d Cir. 1982)). The ALJ bears this duty even when the claimant is represented by counsel. Id. Toward this end, the ALJ must make every reasonable effort to help an applicant get medical reports from her medical sources. 20 C.F.R. § 404.1512(d). More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine [plaintiff's] residual functional capacity." Casino-Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. §

404.1513(e)(1)-(3)). Therefore, the ALJ must seek additional evidence or clarification when the "report from [plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1). In short, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information to fill any clear gaps from the physician before dismissing the doctor's opinion. See, e.g., Rosa, 168 F.3d at 79 (citing Shaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information... *sua sponte.*")).

In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests, and must address all pertinent evidence. See, e.g., Ferraris, 728 F.2d at 586-87; Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his]

conclusions.'" <u>Pacheco v. Barnhart</u>, 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004) (quoting <u>Rivera v. Sullivan</u>, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). Courts in this Circuit have long held that an ALJ's "'failure to acknowledge relevant evidence or explain its implicit rejection is plain error.'" <u>Kuleszo v. Barnhart</u>, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting <u>Pagan v. Chater</u>, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); <u>Butts v. Barnhart</u>, 388 F.3d 377, 382 (2d Cir. 2004). If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. <u>Rosa</u>, 168 F.3d at 82-83 (quoting <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996)). "'[W]hen further findings would so plainly help to assure the proper disposition of the claim, remand is particularly appropriate.'" <u>Butts</u>, 388 F.3d at 385 (quoting <u>Rosa</u>, 168 F.3d at 83). If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of

benefits. See, e.g., Carroll, 705 F.2d at 644 (where "reversal is based solely on the [Commissioner's] failure to sustain [his] burden of adducing evidence of [plaintiff's] capability of gainful employment and the [Commissioner's] finding that [plaintiff] can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by remanding the case for a rehearing[.]").

Therefore, if the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the [reviewing] court determines there is substantial evidence of disability in the administrative record, it may decide to reverse the Commissioner's decision, make a determination of disability and remand solely for the calculation of benefits. Such a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose.

Rivera, 379 F. Supp. 2d at 604.

_____

II. Proof of Disability

For purposes of Social Security disability insurance benefits, one is "disabled" within the meaning of the Act, and thus entitled to benefits, when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[58] Carroll, 705 F.2d at 641-42 (quoting 42 U.S.C. § 423(d)(1)(A)). The Act additionally requires that the impairment be "of such severity that [plaintiff] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Butts, 388 F.3d at 383 (quoting 42 U.S.C. § 423(d)(2)(A)). Furthermore, if plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that openings for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A).

In evaluating disability claims, the Commissioner is required to apply a five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v). This Circuit has described this sequential process as follows:

> *First*, the Secretary considers whether the claimant is
> currently engaged in substantial gainful activity. If

---

[58] Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1520.

not, the Secretary *next* considers whether the claimant
has a "severe impairment" which significantly limits
[her] physical or mental ability to do basic work
activities. If the claimant suffers from such an
impairment, the *third* inquiry is whether, based solely on
medical evidence, the claimant has an impairment which is
listed in Appendix 1 of the Regulations. If the claimant
has such an impairment, the Secretary will consider [her]
disabled without considering vocational factors such as
age, education, and work experience; the Secretary
presumes that a claimant who is afflicted with a "listed"
impairment is unable to perform substantial gainful
activity. Assuming the claimant does not have a listed
impairment, the *fourth* inquiry is whether, despite the
claimant's severe impairment, [she] has the residual
functional capacity to perform [her] past work. *Finally*,
if the claimant is unable to perform [her] past work, the
Secretary then determines whether there is other work
which the claimant could perform.[59]

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996) (emphasis in

original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d

Cir. 1983)).


Plaintiff bears the burden of proof on the first four steps,

but the Commissioner bears the burden on the fifth step, and thus

---

[59] Residual functional capacity is a claimant's maximum
remaining ability, despite her limitations, to do sustained work
activities in an ordinary work setting on a regular and
continuing basis. The RFC assessment must include a discussion of
the individual's abilities on that basis. Schultz v. Astrue, 2008
WL 728925, *6 (N.D.N.Y. Mar. 18, 2008) (quoting Melville v.
Apfel, 198 F.3d 45, 52 (2d Cir. 1999)). If a claimant has more
than one impairment, all medically determinable impairments must
be considered, including those that are not "severe." The
assessment must be based on all relevant medical and other
evidence, such as physical abilities, mental abilities, and
symptomology, including pain and other limitations that could
interfere with work activities on a regular and continuing basis.
20 C.F.R. §§ 404.1545(a)(1)-(3).

must demonstrate the existence of jobs in the economy that plaintiff can perform. See, e.g., Rosa, 168 F.3d at 77; Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). Normally, in meeting his burden on this fifth step, the Commissioner can rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grids."[60] Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). However, if the plaintiff suffers from nonexertional limitations,[61] exclusive reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

   When employing this five-step analysis, the Commissioner must

---

[60] The Grids take into account the claimant's residual functional capacity in conjunction with her age, education and work experience. Based on these factors, the Grids indicate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla, 915 F. Supp. at 667. The Grids classify work into five categories based on the exertional requirements of the different jobs. Specifically, it describes work as sedentary, light, medium, heavy or very heavy, based on the job requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at 667 n.3.

[61] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). Rosa, 168 F.3d at 78, n.2 (citing Zorilla, 915 F. Supp. at 667 n.3). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." Samuels v. Barnhart, 2003 WL 21108321, *11 (S.D.N.Y. May 14, 2003); see also 20 C.F.R. §§ 404.1569(c)(1)(i)-(vi).

consider: 1) objective medical facts and clinical findings; 2) diagnoses and medical opinions of examining physicians; 3) plaintiff's subjective evidence of pain and physical incapacity as testified to by herself and others who observed her; and 4) plaintiff's age, education and work history. Carroll, 705 F.2d at 643 (citing Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)).

III. Assessment of the Record

Applying the required five-step framework to plaintiff, the ALJ found that 1) she was not engaged in substantial gainful activity; 2) she had a severe medical impairment; 3) her impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) she did not have the ability to do her past work as a social worker; and 5) she retained the residual functional capacity to engage in a "full range of sedentary work." (Tr. 15-21). The ALJ concluded that this RFC, in combination with plaintiff's age of 39, her Master's degree in social work, and her ability to communicate in English, dictated that she was "not disabled," according to the Medical-Vocational Guidelines Rule 201.28. (Tr. 20-21).

For analytical coherence, we first consider the problems with the ALJ's finding that plaintiff can perform a full range of sedentary work, specifically his rejection of her treating

physicians' conclusions, his dismissal of plaintiff's subjective complaints of pain, and his failure to consider the incompleteness of the record before him. We then turn to the difficulties with the ALJ's finding that there are substantial numbers of jobs that a person in plaintiff's circumstances can perform. Finally, we address the question of the appropriate remedy.

A. <u>The ALJ's Conclusion that Plaintiff Could Perform Sedentary Work</u>

The key to the ALJ's recommended denial of plaintiff's benefit application was his determination that plaintiff could perform sedentary work. To reach that result, the ALJ had to reject the opinions of plaintiff's treating physicians, who in substance found that she could not do such work because she could not sit, stand, walk or perform other exertional activities for sufficiently prolonged periods of time. The ALJ also had to discount the opinion of plaintiff's treating psychologist, who determined that her mental impairments prevented her from working.

The SSA regulations advise that "a treating source's opinion on the issues(s) of the *nature and severity of* [a plaintiff's] *impairment(s)* will be given 'controlling weight' if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence" in the record. <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2))(emphasis in original); <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Rosa</u>, 168 F.3d at 78-79 (stating that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.). Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567-68 (2d Cir. 1993), the opinion of the treating physician is not afforded controlling weight if it is not consistent with other substantial evidence in the record, such as the opinions of other medical experts. <u>Halloran</u>, 362 F.3d at 32 (citing <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002) (the "treating physician's opinion is not controlling when contradicted 'by other substantial evidence in the record.'")); 20 C.F.R. § 404.1527(d)(2).

However, even when the treating physician's opinion conflicts with other medical evidence, the ALJ must still consider various "factors" to determine how much weight to give that doctor's opinion. Among those considerations are: 1) the frequency of examination and length, nature and extent of the treatment relationship; 2) evidence in support of the treating physician's opinion; 3) the consistency of the opinion with the record as a whole; 4) whether the opinion is from a specialist; and 5) other factors brought to the SSA's attention that support or contradict

the opinion. Halloran, 362 F.3d at 32 (citing 20 C.F.R. §
404.1527(d)(2)); Fox v. Astrue, 2008 WL 828078, *8 (N.D.N.Y. Mar.
26, 2008). Additionally, the regulations direct the Commissioner to
"'give good reasons in [his] notice of determination or decision
for the weight [he] gives [plaintiff's] treating source's
opinion.'" Id. (citing 20 C.F.R. § 404.1527(d)(2)). Failure to
provide explicit "good reasons" for not crediting a treating
source's opinion is a ground for remand. Snell, 177 F.3d at 133
(citing Schaal, 134 F.3d at 505).

Plaintiff claims that it was reversible error for the ALJ not
to give proper weight to plaintiff's treating sources. (Pl.'s Mem.
11). We agree in part.

      i. The ALJ's Assessment of Dr. Compain's Findings

One of plaintiff's treating physicians, Dr. Compain, opined
that plaintiff was impaired in walking, standing and sitting and
could not engage in these activities for more than four hours in an
eight-hour workday. (Tr. 299). He further opined that plaintiff was
able only "occasionally" to lift or carry up to five pounds, and
that she could "rarely/never" lift or carry anything heavier. (Tr.
300). If Dr. Compain's opinion were credited, it would direct a
finding that plaintiff is disabled because it indicates that she is
not capable of performing the tasks required for sedentary level

exertional work.[62] As support for his opinion that plaintiff is limited in walking, standing and sitting, Dr. Compain listed various diagnoses that are substantiated in other parts of the record, including rheumatoid arthritis (Tr. 103, 127, 205, 223, 224, 231, 234, 238, 259, 269, 288), and Lyme disease. (Tr. 62, 100, 102-03, 117, 124, 204, 205, 212, 236-37, 269).

The ALJ did not give controlling evidentiary weight to Dr. Compain's opinion, stating that he provided no objective findings. (Tr. 18). In so determining, the ALJ asserted that Dr. Compain's opinion was based upon the plaintiff's subjective complaints. (Id.). We disagree.

Dr. Compain did provide objective evidence, which the ALJ even acknowledged in his decision.[63] In Dr. Compain's earliest submitted progress notes, dated June 2, 2003, he noted a positive PCR and a positive SPECT scan, which supported a diagnosis of arthritis in

_____

[62] Sedentary work is the least rigorous of the five categories of work recognized by SSA regulations. Rosa, 168 F.3d 72 at 78 (citing Schaal, 134 F.3d at 501 n.6). Sedentary work is defined as work that involves lifting and carrying light objects. It also generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday. Sedentary work also involves "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools." See SSR 83-10; 20 C.F.R. § 404.1567(a).

[63] The ALJ mentions, in reference to Dr. Compain's reports, laboratory reports of Lyme tests, sedimentation rates and rheumatoid factor. (Tr. 17).

plaintiff's upper extremities. (Tr. 206). Next, Dr. Compain submitted lab reports dated October 18, 2004, which tested for Lyme disease and rheumatoid arthritis. (Tr. 236-39). Those labs not only revealed positive Lyme Antibody ELISA results, but also listed a high rheumatoid arthritis factor and a high sedimentation rate. (Tr. 236-38). Additionally, in Dr. Compain's letter dated November 8, 2004, he noted that plaintiff had a positive result in ELISA Lyme testing, although her Lyme testing for Western Blot was equivocal. (Tr. 102-03). Dr. Compain also noted these objective findings -- positive rheumatoid arthritis factor, high sedimentation rate, and positive result in Lyme ELISA test -- on his Physical Functional Capacity Assessment as the basis for his diagnosis of rheumatoid arthritis, Lyme disease and dysmenorrhea, and his opinion that plaintiff was capable of only "low-stress jobs." (Tr. 296-302).

Dr. Compain's specific diagnoses of rheumatoid arthritis and Lyme disease are also consistent with, and substantiated by, the findings of Drs. Horowitz and Kucherov, whose opinions or impressions the ALJ never mentioned. For example, Dr. Horowitz not only indicated that plaintiff's labs showed consistency with Lyme disease, but also opined that plaintiff was unable to work because of her symptoms and need for monthly treatment. (Tr. 204-05). Additionally, Dr. Compain's objective findings of plaintiff's Lyme test results and sedimentation rate are confirmed by those of Dr.

Kucherov. Specifically, Dr. Kucherov's lab reports from 2004 also indicated a high sedimentation rate and positive Lyme Immunology test result, though accompanied by an indeterminate Lyme Western Blot test. (Tr. 192-93, 276). Furthermore, Dr. Kucherov opined, based on the MRI performed on plaintiff, that his "findings were consistent with the patient's history of Lyme disease." (Tr. 117). Dr. Compain's diagnosis of chronic Lyme Disease is corroborated by the State agency consultative examiner, Dr. Shulman, in that she diagnosed plaintiff with Lyme disease and "status post infection". (Tr. 100).

More significantly, "a treating physician's failure to include objective support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." Fox, 2008 WL 828078, *8 (citing Rosa, 168 F.3d at 80); Tavarez v. Barnhart, 124 Fed. Appx. 48, 50 (2d Cir. Mar. 2, 2005). Thus, even if we assumed that Dr. Compain did not provide enough objective evidence for the record -- and we are not persuaded that he failed to do so -- the ALJ then failed in his duty to develop the record fully. While the ALJ claimed that Dr. Compain provided no objective findings, he also made no effort to obtain additional records or reports from the doctor. By determining that Dr. Compain's opinions and findings were not entitled to controlling weight without

seeking additional clarification or information, the ALJ failed to properly develop the record and thereby committed legal error. <u>See</u>, <u>e.g.</u>, <u>Rosa</u>, 168 F.3d at 80.

In the same vein, the ALJ should have also requested a more complete set of progress notes from Dr. Compain. For example, while Dr. Compain indicated that he examines plaintiff every two months, his progress notes skip from sometime in 2003 to September 27, 2004. (Tr. 170, 209). This is surely the kind of "clear gap" in the record that precludes a finding of completeness, and therefore calls for the ALJ to dutifully develop the record by contacting Dr. Compain to supplement his findings and provide additional information. <u>See</u> <u>Rosa</u>, 168 F.3d at 79-80 (holding that an ALJ committed legal error where she failed to request additional records or support from a treating physician, when she had only treating physician's sparse notes reflecting nine visits, considerably fewer visits than the two likely had based upon plaintiff's testimony suggesting monthly treatment over a period of years). Therefore, it was error for the ALJ to discount Dr. Compain's opinion simply for the reason that it allegedly lacked support of objective findings. (Tr. 18).

Apart from these errors, the ALJ erred by failing to address some of the key factors cited in the treating-physician regulation. These factors include the duration and nature of the treating

relationship, the evidence in support of the treating doctor's opinion, and the consistency of his opinion with the record as a whole. 20 C.F.R. 404.1527(d)(2). According to the regulations, generally more weight will be given to treating sources because they

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

Disarno v. Astrue, 2008 WL 1995123, *3 (W.D.N.Y. May 6, 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Compain had been treating plaintiff intermittently since 1994, and regularly (i.e., every two to four months) since 2003. Therefore, he must have had a longitudinal perspective of plaintiff's medical conditions. While the ALJ acknowledges the start date of plaintiff's treatment with Dr. Compain (Tr. 18), he is silent on the frequency of examinations and the nature of the relationship. (Tr. 296). As for the objective evidence of record, it appears to support Dr. Compain's diagnoses, as X-rays and MRI findings have shown that plaintiff suffers from Lyme disease and rheumatoid arthritis. (Tr. 117, 222-29).

Instead of ascribing significant weight to Dr. Compain's

assessment, the ALJ appeared to give greater weight to the consultative examination performed by Dr. Shulman, who reported "at this point in time, based on today's exam, there would be no restrictions," even though she diagnosed plaintiff with Lyme disease and offered a "Fair" prognosis. (Tr. 100). Another instance where the ALJ gave greater weight to a consultative examiner's opinion as opposed to Dr. Compain's opinion was in his determination that plaintiff "has no cognitive dysfunction." (Tr. 18). This conclusion is contrary to Dr. Compain's report of plaintiff's cognitive dysfunction. (Tr. 114). To arrive at his conclusion, the ALJ relied on the fact that Dr. Gindes, a consulting physician, once conducted cognitive testing that showed plaintiff "is functioning in the average to above-average range." (Tr. 18). As noted, the reports of one-time consultative examinations are generally given less weight because they lack the "unique perspective to the medical evidence that a treating physician's opinion would provide." Goldthrite v. Astrue, 535 F. Supp. 2d 329, 336 (W.D.N.Y. 2008) (citing 20 C.F.R. § 404.1527(d)(2). "To give [a consulting physician's] one-time examinations more weight than [the treating physician's] opinions representing patient contact and treatment over an extensive period of time was clear error."[64] Id.

---

[64] Additionally, the ALJ's reliance on Dr. Gindes's testing to arrive at his conclusion that plaintiff has "no cognitive dysfunction" may be misplaced. While Dr. Gindes opined that plaintiff "is functioning in the average to above average range,"

Furthermore, "as explained by the SSA, when the ALJ's determination: is not fully favorable, e.g., is a denial... [,] the notice of the determination or decision must... be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion..." Disarno, 2008 WL 1995123, *4 (quoting SSR 96-2p). Significantly, there is nothing in the ALJ's October 23, 2006 determination to indicate how much weight -- save that he was not giving "controlling weight" -- the ALJ gave to Dr. Compain's opinion as to the nature and severity of plaintiff's medical conditions and his conclusion that she was not able to perform a full range of sedentary work. (Tr. 19). Therefore, a remand is necessary for the ALJ to re-weigh the evidence and state explicitly what weight he is giving Dr. Compain's opinion.

ii. The ALJ's Assessment of Dr. Gaito's Findings

It also appears that the ALJ improperly applied -- or failed to apply -- the treating-physician rule in assessing Dr. Gaito's opinion. Like Dr. Compain, Dr. Gaito opined that plaintiff was impaired in walking, standing and sitting and that she could not engage in these activities for more than four hours in an eight-

---

cognitively, this finding does not explicitly lead logically to the ALJ's conclusion that plaintiff has "no cognitive dysfunction." (Tr. 18).

hour workday. (Tr. 291). Dr. Gaito further opined that plaintiff could "occasionally" lift and carry up to ten pounds, and "rarely/never" carry anything heavier. (Tr. 292). If her opinion were credited, it would also direct a finding that plaintiff is disabled because it indicates that she is not capable of performing the tasks required for sedentary-level work. As support for her opinion that plaintiff is limited in walking, standing and sitting, Dr. Gaito listed plaintiff's diagnosis as rheumatoid arthritis (Tr. 288), which is substantiated in other parts of the record, such as in Dr. Compain's equivalent diagnosis. (Tr. 103, 127, 205, 223, 224, 231, 234, 238, 259, 269, 288). In addition, Dr. Gaito submitted objective and clinical findings in the form of X-rays revealing rheumatoid arthritis (Tr. 222-29), and lab tests showing a positive rheumatoid-arthritis factor. (Tr. 231-33, 235).

Despite those findings, and Dr. Gaito's notation on September 8, 2006 that plaintiff had joint warmth, deformity, instability, tenderness, reduced grip strength, redness, swelling, muscle weakness, and muscle atrophy, the ALJ discounted her opinion, stating that it was not supported by progress notes. (Tr. 18). However, this statement is unjustified.

First, the progress notes to which the ALJ refers are not Dr. Gaito's, but are from Dr. Compain. (Tr. 172, 176, 178-79). In fact, Dr. Gaito's undated progress notes (Tr. 259-67) were not even

addressed by the ALJ. Those progress notes indicate, at one point, that plaintiff's "[metacarpophalangeal] joints are lagging," and her "elbow is a little tight," though at another time, she stated that plaintiffs arms were "straightened out," and her "grip strength was better." (Tr. 261-62). Therefore, it is entirely possible that Dr. Gaito's progress notes do support her medical opinion. However, the ALJ did not consider that possibility.

Second, because these notes are undated, it is impossible, in their present state, to accurately place them within plaintiff's medical time-line. Therefore, when the ALJ considers these notes, he needs to seek clarification from Dr. Gaito pursuant to the ALJ's duty to fully develop the record. As noted, "when the evidence [the Commissioner] receive[s] from [a] treating physician... is inadequate for [the Commissioner] to determine whether [a plaintiff is] disabled... [the Commissioner] will first re-contact [plaintiff's] treating physician... to determine whether additional information... is readily available." Rodriguez v. Barnhart, 2006 WL 988201, *4 (S.D.N.Y. Apr. 13, 2006) (citing 20 C.F.R. § 404.1512(e)). Accordingly, the ALJ may not reject a treating physician's conclusions based solely on inconsistency without first attempting to fill the gaps. Villani v. Barnhart, 2008 WL 2001879, *6 (E.D.N.Y. May 8, 2008) (citing Rosa, 168 F.3d at 79).

Third, after noting that Dr. Gaito had found that plaintiff was limited to sitting for two hours, standing for one to two hours, and walking one-half to one hour continuously, for a total of four hours of sitting and standing or walking in an eight-hour workday (Tr. 291), the ALJ made no mention of the weight he accords that opinion. Again, this was error.

Finally, in rejecting Dr. Gaito's conclusion, the ALJ failed to address some of the key factors that are cited in the treating-physician regulation. These include the duration and nature of the treating relationship, and the fact that Dr. Gaito is a Lyme specialist. (Tr. 124). Dr. Gaito had been treating plaintiff every three months since October 2004 (Tr. 288), and must also have extended acquaintance with plaintiff's medical conditions, especially her Lyme disease. Furthermore, as a specialist, Dr. Gaito's opinion may offer even more insight into the nature and severity of plaintiff's impairments. This is a factor that the ALJ must consider in his determination whether to give "controlling weight" to a plaintiff's treating source and, if not, how much weight to give. 20 C.F.R. § 404.1527(d)(2). Notably, the ALJ did not consider these factors, thus necessitating a remand for the ALJ to first consider Dr. Gaito's progress notes, re-weigh the evidence, and state explicitly what weight he is giving to Dr. Gaito's opinion and the reasons for that weight.

The  ALJ  also  committed  legal  error  in  assessing  Dr. Projansky's findings. After acknowledging Dr. Projansky's opinion that plaintiff's symptoms of depression and anxiety were related to her  rheumatoid  arthritis,  and  that  plaintiff  "was  not  able  to work...  due  to  medical  limitations,"  the  ALJ  discounted  this finding because Dr. Projansky, a psychologist, "is not a medical physician; and therefore, her opinion is not given great weight." (Tr. 18). However, this justification for rejecting her assessment is legally erroneous.

According  to  the  Regulations,  acceptable  medical  sources  who can  provide  evidence  and  medical  opinions  to  establish  a plaintiff's  impairment  include  licensed  or  certified "psychologists,"[65]  20  C.F.R.  §  404.1513(a)(2),  such  as  Dr. Projansky.[66] In fact, as one of plaintiff's treating sources, Dr.

---

[65] These medical opinions from physicians and psychologists -- if a treating source -- are entitled to treating-physician-rule application. See 20 C.F.R. §§ 404.1527 (a) & (d). Specifically, the Commissioner's regulations provide that, "if we find that a treating *source's* opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record, we will give it controlling weight." Feliciano v Barnhart, 2005 WL 1693835, *9 (S.D.N.Y. July 21, 2005) (citing 20 C.F.R. § 404.1527(d)(2)) (emphasis added).

[66] On the New York State Office of Temporary and Disability Assistance Division of Disability Determinations Form signed by

Projansky's opinion is entitled to "controlling weight" if it is supported by "medically acceptable evidence and is not inconsistent with the other substantial evidence in [the] record." See, e.g., Snell, 177 F.3d at 133 (citing 20 C.F.R. § 404.1527(d)(2)); Fox, 2008 WL 828078, *8; Feliciano, 2005 WL 1693835, at *15 (applying the treating-physician rule to plaintiff's treating psychiatrist).

In this case, the ALJ did not even consider how Dr. Projansky's opinion that plaintiff was unable to work due to her medical limitations aligned with the evidence of record, and therefore misapplied the treating-physician regulation. On this point, it bears mentioning that Dr. Projansky's opinion concerning plaintiff's ability to work is consistent with the opinions of Drs. Compain and Horowitz that plaintiff's medical impairments, including her mental status, precluded her from functioning effectively in a work setting. Specifically, Dr. Projansky opined that plaintiff's neurological symptoms (memory loss, confusion, word retrieval difficulty, sensitivity to light and sound, dizziness), depression, and anxiety, etc. precluded her from working. Dr. Compain similarly opined that plaintiff's symptoms of cognitive dysfunction, difficulty with concentration and word retrieval, and sensory sensitivity contributed to precluding her

_____

Dr. Projansky on January 16, 2005, she indicated her title as "Psychologist." (Tr. 138).

ability to function effectively in her work capacity. (Tr. 114).
Additionally, Dr. Horowitz wrote in his letter dated April 2, 2003
that plaintiff's sensitivity to light and sound, confusion,
difficulty thinking, remembering and concentrating, and reversing
of letters and numbers precluded her ability to work. (Tr. 205).

In disregarding Dr. Projansky's conclusions, the ALJ also
failed to address some of the key factors cited in the treating-
physician regulation, as he did with Drs. Compain and Gaito. This
omission is quite significant. Dr. Projansky had been treating
plaintiff regularly for at least seven years (Tr. 132), and must,
like Drs. Compain and Gaito, have a longitudinal perspective of
plaintiff's medical conditions. Because the ALJ failed to apply the
treating-physician rule appropriately and failed to "give good
reasons in [his] notice of determination or decision for the weight
[he] give[s] [plaintiff's] treating source's opinion," 20 C.F.R. §
404.1527(d)(2), a remand is necessary for the ALJ to properly weigh
Dr. Projansky's opinion.

        iv. The ALJ's Assessment of Dr. Horowitz's Findings

        Also notably absent from the ALJ's determination is any
discussion of Dr. Horowitz's medical evidence and opinion. That
being the case, the ALJ clearly committed legal error by: 1) not

81

addressing all "pertinent evidence" of record; and, as a result 2) not correctly applying the treating-physician rule to Dr. Horowitz's findings.

First, as noted, it is well-settled that an ALJ must address all pertinent evidence of record, and failure to do so is plain legal error. See, e.g., Diaz, 59 F.3d at 315; Ferraris, 728 F.2d at 586-87; Kulesze F/K/A Dillon, 232 F. Supp. 2d at 57. Dr. Horowitz treated plaintiff for Lyme disease from around 2000 until at least April 2, 2003.[67] (Tr. 206). He opined that as of at least April 2, 2003, plaintiff was unable to work and needed monthly follow-up medical attention. (Tr. 205). Dr. Horowitz submitted lab reports from 2001 pertaining to plaintiff's Lyme disease (Tr. 204, 212), and a status letter concerning her diagnoses, symptoms, and inability to work. (Tr. 205). His opinion and findings were consistent with, and corroborated by, a substantial portion of the record of evidence. (Tr. 99, 102-03, 114, 115, 117, 135, 192, 269). Therefore, the absence of any mention of Dr. Horowitz's medical evidence or opinion by the ALJ amounted to an unjustified failure to consider "all pertinent evidence of record."

---

[67] Dr. Horowitz's letter on April 2, 2003 indicated that plaintiff was a "current patient," but there are no subsequent records from Dr. Horowitz to determine how much longer this treatment relationship lasted, if it did. (Tr. 205).

Second, by failing to consider any of Dr. Horowitz's findings, the ALJ also failed to apply the requisite treating-physician rule to his medical opinion that plaintiff "is unable to work and needs monthly follow-up medical attention." (Tr. 205). In addition, the ALJ failed to "give good reasons" for deciding not to give "controlling weight" –– or any weight –– to Dr. Horowitz's opinion, as required by the regulations.

When the ALJ does consider Dr. Horowitz's medical opinion and evidence, he may find it necessary also to more fully develop the record. According to the existing evidence of record from Dr. Horowitz, he had seen plaintiff from 2000, with some unknown frequency, until at least 2003. However, the records in between are very sparse (i.e., lab reports from 2001 and a status letter in 2003). (Tr. 204, 212). "The record as a whole must be complete and detailed enough to allow the ALJ to determine the [plaintiff's] residual functional capacity." Casino-Ortiz, 2007 WL 2745704, *7 (citing 20 C.F.R. §§ 404.1513(e)(1)-(3)). As it stands, the record does not contain sufficient evidence in light of a possible two-year treatment relationship, and the ALJ must therefore first try to contact Dr. Horowitz for additional information.

In short, remand is necessary for the ALJ to acknowledge Dr. Horowitz's medical opinion, potentially to seek more information

from him, to weigh his opinion in light of the evidence of record, and to  explicitly and adequately state what weight he accords Dr. Horowitz's opinion, and his reasons for that weight.


        v. The ALJ's Assessment of Plaintiff's Other Medical Source,
           Irene Humbach


        In support of her application for disability benefits, plaintiff offered reports from an additional medical source, Ms. Irene Humbach, a licensed clinical social worker and psychotherapist. (Tr. 269-70, 275). Plaintiff contends that in reaching a conclusion that plaintiff was not disabled, the ALJ improperly disregarded Ms. Humbach's opinion. We agree.


        As a clinical social worker and psychotherapist, Ms. Humbach is admittedly not an "acceptable medical source" for purposes of establishing plaintiff's medically determinable impairments." See 20 C.F.R. §§ 404.1415(a)(1)-(5). However, in determining the degree of plaintiff's functional limitations, the ALJ may consider evidence  from "other sources," which include "public or private social welfare agency personnel." 20 C.F.R. § 404.1513(d)(3); White v. Comm'r of Soc. Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004). The decision whether to do so is reviewable by the court. For example, in White, the court concluded that the ALJ had erred in not giving appropriate weight to claimant's social worker as "other

source" evidence, particularly "given that [she] had a regular treatment relationship with plaintiff." White, 302 F. Supp. 2d at 176; accord Pogozelski v. Barnhart, 2004 WL 1146059, *12 (E.D.N.Y. May 19, 2004) ("although not a physician, and thus not entitled to the level of deference accorded under the 'treating physician rule,' some weight should still have been accorded to [plaintiff's treating therapist]'s opinion based on his familiarity and treating relationship with the claimant."); Mejia v. Barnhart, 261 F. Supp. 2d 142, 148 (E.D.N.Y. 2003) ("Although a psychotherapist's report is not an 'acceptable medical source'...as the report of a primary treatment provider, [the psychotherapist's] report should have been accorded more than a 'little' weight as 'an other medical source' pursuant to 20 C.F.R. 404.1513(d)(1).").

In this case, Ms. Humbach was seeing plaintiff since July, 2005 on a biweekly basis, and thus her observations would be relevant on the issue of the intensity and persistence of plaintiff's symptoms, which in turn affect plaintiff's residual functional capacity for work-related physical and mental activities, and hence the ultimate disability determination. 20 C.F.R. §§ 404.1513(e)(1) & (3). Although the ALJ is entitled to accord less weight to Ms. Humbach's opinion since she is not an "acceptable medical source," there is no indication that the ALJ considered Ms. Humbach's opinion about plaintiff's symptoms at all.

Therefore, on remand, the ALJ should address Ms. Humbach's opinion insofar as it is relevant to the severity of plaintiff's impairments.

vi. The ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ applied an incorrect legal standard and erroneously determined that plaintiff's statements regarding her impairments were not entirely credible. We agree.

"Throughout the five-step process, 'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms, 750 F.2d at 185). Notwithstanding this, a reviewing court must uphold the ALJ's decision to discount a plaintiff's subjective complaints if substantial evidence supports this determination. Rodriguez, 2006 WL 988201, *5 (quoting Perez, 234 F. Supp. at 341).

When a plaintiff reports symptoms more severe than medical evidence alone would suggest, however, the ALJ must consider other factors in determining the claimant's credibility. An ALJ "must" consider a broad array of factors in "assess[ing] the credibility of [an] individual's statements about symptoms and their effects."

<u>Bush</u>, 94 F.3d at 46. These include: 1) an individual's daily activities; 2) the location, duration, frequency and intensity of pain or symptoms; 3) factors that precipitate and aggravate symptoms; 4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or symptoms; 5) treatment, other than medication, the individual receives or has received for pain or symptoms; 6) measures other than treatment the individual uses or has used to relieve pain or symptoms; and 7) other factors concerning the individual's functional limitations and restrictions due to pain or symptoms. 20 C.F.R. § 404.1529(c)(3); <u>see also</u> <u>Bush</u> 94 F.3d at 46 n.4; <u>Wright v. Astrue</u>, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008)(citing SSR 96-7p).[68]

---

[68] SSR 96-7p says, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. §§ 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

In this case, the ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, her subjective complaints concerning the intensity, persistence and limiting effects of her cognitive and physical symptoms were not entirely credible. (Tr. 16). His analysis, however, was legally inadequate.

First, the ALJ found a contradiction between plaintiff's testimony about her cognitive and physical problems, and her daily activities, including her ability to drive, to socialize, to exercise and to do household chores, such as cooking and gardening. However, the ALJ took many of these aspects of plaintiff's daily activities out of context and ignored pertinent qualifications that plaintiff made about these activities. For example, while the plaintiff is able to drive, and was able to drive to her hearing and a few scheduled examinations, the ALJ disregarded plaintiff's testimony that at times her "ability to drive is compromised," when she is "experiencing brain fog." (Tr. 78). The ALJ also made no mention of plaintiff's testimony that it is sometimes difficult and "uncomfortable" for her to hold the steering wheel. (Tr. 309-10). Similarly, while plaintiff is able to cook and prepare meals, she also stated that when she puts pots of water on the stove or a chicken in the oven, those tasks "cause her a lot of pain." (Tr. 326). She also told the ALJ that she "occasionally has difficulty

following recipes", apparently because of mental confusion. (Tr. 326-27). While plaintiff is able to do her own grocery shopping, she also testified that her "husband helps her put heavy items away." (Tr. 325-26). When it comes to cleaning, vacuuming, dusting and gardening, the ALJ neglected to acknowledge plaintiff's testimony that she is able to do these activities for only a "little bit," and that otherwise her hands "become sore and cramp up for the next several days." (Tr. 327). Significantly, plaintiff also testified that there were days when her household chores took a "back burner" to how she was feeling (Tr. 337) -- testimony that the ALJ failed to acknowledge. The ALJ notably did not ask how frequently plaintiff felt like this, or whether she continued to experience days like this.

By failing to discuss important parts of plaintiff's testimony, and not asking pertinent follow-up questions at the hearing, the ALJ failed in his duty to both develop the record and explain his rejection of evidence favorable to the applicant. The SSA, therefore, left this court "with no basis upon which to determine whether the appropriate legal standards were applied, nor can it evaluate whether the ALJ considered the entire evidentiary record." Schultz, 2008 WL 728925, *13 (citing Harrison v. Sec'y of Human and Health Serv., 901 F. Supp. 749, 757 (S.D.N.Y. 1995)).

Second, it also bears emphasizing that "when a disabled person gamely chooses to endure pain in order to pursue important goals" -- such as, in plaintiff's case, helping her husband part-time with his business and with household chores -- "it would be a shame to hold this endurance against [her] in determining benefits unless [her] conduct truly showed that [she] is capable of working." Balsamo, 142 F.3d at 81-82 (citing Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989)). Furthermore, this Circuit has stated on numerous occasions that "a claimant need not be an invalid to be found disabled under the [Act]." Id. at 82 (citing Williams, 859 F.2d at 260) (quoting Murdaugh v. Sec'y of Dep't of Health and Human Serv., 837 F.2d 99, 102 (2d Cir. 1988) (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" was nevertheless disabled because she could not perform sedentary work))).

In this case, plaintiff's testimony is consistent with her treating physicians' findings that she is incapable of a "full range of sedentary work." In finding, to the contrary, that plaintiff is capable of such work, the ALJ cited plaintiff's daily activities, but cited no proof that plaintiff "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." Carroll, 705 F.2d at 643. On the contrary, as noted, plaintiff often can engage in her household

chores for only a "little bit." (Tr. 327). That plaintiff engaged in household chores for a "little bit," or assisted her husband part-time in his business does not demonstrate that she is capable of performing a full range of sedentary tasks for a prolonged period of time.

Third, the ALJ also erred when he focused on plaintiff's foot pains, suggesting that these pains would not prevent plaintiff from engaging in sedentary work, which can involve sitting for as long as six hours. (Tr. 17). In addition to pain in her feet, plaintiff testified that she is able to sit for only about thirty to forty-five minutes before she has to change positions or move because her hips start to hurt, a condition that the ALJ failed to acknowledge. (Tr. 324). This self-assessment is consistent with both Drs. Compain's and Dr. Gaito's assessments that plaintiff can sit for only about one-half hour to two hours. (Tr. 291, 299). Since sedentary work requires a person to sit for six hours out of an eight-hour workday, 20 C.F.R. § 404.1567(a), plaintiff's testimony supports the conclusion that she is unable to meet the requirements of sedentary work.

Fourth, the ALJ discredited plaintiff's subjective testimony by misstating pertinent parts, and erroneously concluding that her testimony demonstrated an ability to engage in sedentary work. He

stated that plaintiff had testified that her "cognitive problems become worse at night," and on that basis, he concluded that her cognitive difficulties would not interfere with a normal work day. (Tr. 16). Plaintiff never made such statement. On the contrary, she testified that her cognitive problems are at their "worst in the afternoon." (Tr. 332-33). Consistent with that testimony, she reported to Dr. Compain that her "hardest time was 1:00pm - 4:00pm." (Tr. 179). The timing of plaintiff's cognitive difficulties is clearly not "at night," as the ALJ maintains. Instead, they occur in the middle of a normal eight-hour workday. On a similar point, while the ALJ observed that plaintiff exercises at the gym, he neglected to point out that plaintiff testified that she "always goes to the gym in the morning," because her cognitive problems increase as her day progresses. (Tr. 332-33).

Fifth, the ALJ unjustifiably discounted plaintiff's physical complaints about her hand cramping and difficulties with repetitive motion. The ALJ relied upon: (1) progress notes indicating that she had improved range of motion; (2) a report that plaintiff's rheumatoid arthritis was stable on Embrel; and (3) a consultative examination that showed her hand and finger dexterity was intact. (Tr. 17). However, none of this "proof" can sustain the ALJ's decision to discredit plaintiff's complaints.

While one progress note from Dr. Compain, dated November 24, 2004, indicated an increased range of motion in her hands, the same note also stated "achiness in the PM," which the ALJ ignored. (Tr. 174). The ALJ also disregarded later progress notes dated, for example, April 12, 2005, which documented plaintiff's increased "arthralgia in the past month." (Tr. 176). The ALJ also relied, in part, on a report from Dr. Compain dated July 12, 2005, indicating that plaintiff's "arthritis is stable on Embrel." (Tr. 175). However, once again, the ALJ disregarded other pertinent parts of Dr. Compain's progress notes, notably, one on November 9, 2005, reciting that plaintiff was still on Embrel, but continued to experience arthralgia and joint swelling. (Tr. 176-77). In addition, although on one subsequent occasion, Dr. Compain mentioned that plaintiff's arthritis was "OK" (Tr. 179), in his Physical Functional Capacity Assessment on September 7, 2006, he still diagnosed plaintiff with rheumatoid arthritis and daily arthralgia pain in numerous joints, and assessed her as able to use her hands, fingers and arms only ten percent of the time during an eight-hour workday. (Tr. 296, 300).

Finally, apart from the ALJ's misuse of plaintiff's testimony about daily activities and his failure to address pertinent portions of her testimony reflecting limitations as well as the medical evidence corroborating her testimony of her symptoms, the

ALJ failed to properly consider the factors listed in 20 C.F.R. § 404.1529(c)(3). Specifically, while the ALJ acknowledged plaintiff's side effects of dizziness and headaches from her medication, he inaccurately stated that "these side effects were not reported in the medical record." (Tr. 17). On the contrary, these side effects appeared in Dr. Projansky's Psychological and Mental Impairment Functional Capacity Assessment of plaintiff, in which she indicated that the medications plaintiff was taking caused her "dizziness, fatigue, drowsiness, and headache." (Tr. 215). Ms. Humbach's Psychological and Mental Impairment Functional Capacity Assessment of plaintiff also indicated that Embrel caused plaintiff "dizziness", which might interfere with normal work activities. (Tr. 271).

The ALJ also failed entirely to consider "other treatment" that plaintiff was receiving, such as "body-oriented psychotherapy" through Ms. Humbach (Tr. 269), or psychotherapy mentioned by Dr. Projansky. (Tr. 133). Nor did the ALJ consider the location, duration, frequency and intensity of plaintiff's symptoms or pain, which were indicated on assessments completed by both Drs. Compain and Gaito (Tr. 288, 296), and in plaintiff's testimony at her hearing. (Tr. 309). Specifically, Dr. Compain stated that plaintiff experienced arthralgia pain daily in numerous joints (Tr. 296), Dr. Gaito indicated that plaintiff experienced a continuous dull ache

in her shoulders, elbows, knees and hands (Tr. 288), and plaintiff testified that she experienced "sometimes burning, sharp, sometimes continuous" pain in her hands and feet. (Tr. 309). Finally, the ALJ neglected to consider the precipitating factor that aggravates plaintiff's cramping -- repetitive motion.[69] (Tr. 288).

Plaintiff also properly notes that the ALJ failed to consider "strongly" plaintiff's consistent work record when evaluating her credibility. (Pl.'s Mem. 12). Specifically, plaintiff maintains that she worked steadily, showed significant earnings, and is presently working at a greatly reduced level. (Id.). A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability. Rivera, 717 F.2d at 725 (citing Singletary v. Sec'y of Health, Educ. and Welfare, 623 F.3d 217, 219 (2d Cir. 1980)). The ALJ should have considered plaintiff's "efforts to work," including her history and her subsequent attempt to work part-time. Garrett v. Astrue, 2007 WL 4232726, *9 (W.D.N.Y. Jul. 18, 2007) (citing Schaal, 134 F.3d at 502 ("ALJs are specifically instructed that credibility determinations should take account of 'prior work record.'")).

In this case, plaintiff worked consistently as a social worker

_____

[69] Dr. Compain also opined that "any significant physical activity above part-time exacerbates" plaintiff's condition. (Tr. 299).

from 1986 to 2002 (Tr. 59, 310), and currently makes the effort to work part-time two to three times a week at a boutique. (Tr. 313, 332). While the ALJ acknowledged plaintiff's part-time job, rather than use it to enhance plaintiff's credibility, he used her "efforts to work" as a factor to discount her credibility. (Tr. 16). This was error. The ALJ also did not explicitly consider plaintiff's long and consistent work history as a social worker. This, too, was error.

vii. No Support from Consulting Examiners on Plaintiff's Ability to Perform Sedentary Work

The ALJ's conclusion that plaintiff can perform sedentary work is not only unsupported by plaintiff's treating source opinions or her own testimony, but is also unsupported by consulting examiners' findings. As noted, by its very nature, "sedentary" work requires a person to sit for long periods of time, even though standing and walking or occasionally required. Carroll, 705 F.2d at 643 (citing 20 C.F.R. § 404.1567(a)). Significantly, three out of four consulting physicians or examiners (Drs. Shulman, Gindes and Petro) "were never asked what work or activity, such as sedentary employment, [plaintiff] could perform and hence expressed no opinion on that subject." Carroll, 705 F.2d at 643. For example, while Dr. Shulman concluded, based on her one-time examination of plaintiff, that she had "no restrictions," there is no indication

in her report that any test was conducted regarding plaintiff's ability to stand, walk or sit for the prolonged period of time required by sedentary work. (Tr. 98-100). In fact, the only evaluation Dr. Shulman made of plaintiff's hips, knees and ankles, concerned their range of motion (Tr. 100) –- nothing about their capabilities for prolonged use. Drs. Gindes and Petro similarly made no findings regarding plaintiff's physical functional capabilities for sedentary work, since their evaluations were focused primarily on plaintiff's intelligence and mental capacities. (Tr. 124-31, 145-62).

The ALJ, therefore, concluded, without any express medical evidence or opinion from consulting examiners, that plaintiff can perform sedentary work. This problem stemmed from the fact that the Commissioner, who has the burden on this issue, failed to introduce any evidence, such as testimony of a vocational expert or consulting physician, that plaintiff could hold such jobs. Carroll, 705 F.2d at 643.

B.    The ALJ's Determination of a Significant Number of Jobs
       in the National Economy

If plaintiff shows that her impairment renders her unable to perform her past work –- as the SSA conceded -- the burden then shifts to the Commissioner to show that there is other gainful work

in the national economy which plaintiff could perform. <u>See</u> <u>Carroll</u>, 705 F.2d at 642 (citing <u>Berry</u>, 675 F.2d at 467); <u>Campbell v. Sec'y of Health and Human Serv.</u>, 665 F.2d 48, 51 (2d Cir. 1981). In doing so, the ALJ, however, misapplied the Medical-Vocational guidelines ("the Grids") in determining that there are a significant number of jobs in the national economy for which plaintiff qualifies given her functional impairments.

Generally speaking, if plaintiff suffers only from exertional limitations, the Commissioner may satisfy his burden by resorting to the Grids. <u>Rosa</u>, 168 F.3d at 82. However, "where significant nonexertional impairments are present at the fifth step in the disability analysis...'application of the grids is inappropriate.'" <u>Id</u>. (quoting <u>Bapp</u>, 802 F.2d at 605-06). A nonexertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use the fingers for fine activities." <u>Casino-Ortiz</u>, 2007 WL 2745704, *13 (citing SSR 83-10).[70]

---

[70] According to the Regulations, examples of nonexertional limitations or restrictions include: 1) difficulty functioning because of nervousness, anxiety, or depression; 2) difficulty maintaining attention or concentration; 3) difficulty understanding or remembering detailed instructions; 4) difficulty

This Circuit has held that when nonexertional impairments "'significantly limit the range of work permitted by [plaintiff's] exertional limitations,'" the Grids will not accurately determine disability status because they fail to take into account nonexertional impairments. Bapp, 802 F.2d at 605 (quoting Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (per curiam)). In such circumstances, the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which [plaintiff] can obtain and perform." Id. at 603.

In this case, the ALJ considered plaintiff's residual functional capacity, age, education and work experience in conjunction with the Grids, and concluded that plaintiff could perform a "full range of sedentary work," and that there are jobs that exist "in significant numbers in the national economy that [plaintiff] can perform." (Tr. 21). The ALJ relied exclusively on the Grids to conclude that plaintiff was "not disabled." (Tr. 20-21). However, the problem with his conclusion is that he apparently found no nonexertional limitations, which was error in light of the evidence of record. As such, the ALJ also erroneously failed to

in seeing or hearing; 5) difficulty tolerating some physical feature(s) of certain work settings, e.g., dust or fumes; or 6) difficulty performing the manipulative or postural functioning of some work such as reaching, handling, stopping, climbing, crawling, or crouching. 20 C.F.R. § 404.1569a(c)(1).

consult a vocational expert (or other similar evidence) to accurately establish the existence of jobs in the national economy that plaintiff could perform.

The evidence of record establishes that plaintiff does suffer from nonexertional limitations, which means that the ALJ may not exclusively rely, as he did, on the Grids to determine that there are jobs in the national economy that plaintiff can perform. For example, Dr. Projansky opined that "plaintiff's neurological symptoms as well as depression and anxiety, energy level, ability to focus and maintain concentration were severely impaired by her illnesses." (Tr. 215). Additionally, Dr. Projansky opined that plaintiff had "Poor/None" ability to complete a normal workday or week without interruptions from psychologically based symptoms. (Tr. 217). Furthermore, the ALJ failed to mention Ms. Humbach's opinion which also cited nonexertional limitations. She opined that, due to the neurological damage from Lyme disease, plaintiff has developed extreme sensitivity to stimulants such as lighting, noise and changes in temperatures, which cause her to become distracted, irritable, unfocused and anxious. (Tr. 269). These are all nonexertional limitations that clearly affect plaintiff's mind and vision, and do not necessarily go to the strength demands of sedentary work. With respect to plaintiff's ability to perform manipulative or postural functions of some work, such as reaching

or handling, the ALJ did not consider Drs. Compain's and Gaito's opinions that plaintiff had "significant limitations" in doing repetitive reaching, handling or fingering. (Tr. 292, 300). These nonexertional limitations must be considered by the ALJ in order to evaluate their effect on her ability to perform a "full range of sedentary work."

The ALJ, therefore, erroneously concluded, based solely on the Grids, that plaintiff was not disabled, and in doing so failed to acknowledge her nonexertional limitations, and as a result, did not consider whether a vocational expert was necessary in light of them. Pratts, 94 F.3d at 39; see also, Bapp, 902 F.2d at 606-07. Accordingly, remand is necessary. Upon remand, the ALJ should first consider whether plaintiff's nonexertional limitations significantly diminish her ability to perform a "full range of sedentary work." Bapp, 902 F.2d at 605. If the ALJ so finds, then he is required to obtain testimony of a vocational expert or other similar evidence concerning the existence of jobs in the national economy for an individual with plaintiff's limitations. Bapp, 902 F.2d at 606.

C. Nature of the Remedy

For reasons noted, the Commissioner's decision cannot stand. The question remains, however, whether the case should be remanded

for further consideration or simply for calculation of benefits. Plaintiff argues that reversal and remand for calculation and payment of benefits is appropriate because the "evidence supports a finding that Longobardi is disabled as claimed[.]" (Pl.'s Mem. 13). We disagree.

As noted, upon a finding that an administrative record is incomplete or that an ALJ has applied improper legal standard, courts generally remand the matter to the Commissioner for further consideration. Curry, 209 F.3d at 124 (citing Rosa, 168 F.3d at 82-83) ("where there are gaps in the record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded for further development of the evidence"). In addition, where the ALJ failed to develop the record sufficiently to make appropriate disability determinations, remand for further findings that would plainly help to assure the proper disposition of plaintiff's claim is particularly appropriate. Butts, 388 F.3d at 386 (citing Rosa, 168 F.3d at 83).

In this case, there are certainly gaps in the administrative record, and the ALJ has, in various respects, applied improper legal standards and misstated the record. Plaintiff's medical records also contain a number of inconsistencies that may require clarification. For example, while a letter from Dr. Compain, dated

November 8, 2004, indicated that plaintiff's sedimentation rate was in the 40-50 mm/hour range (Tr. 103), the lab report he submitted indicated plaintiff's sedimentation rate to be 30 mm/hour (Tr. 238), and Dr. Gaito's lab reports indicated plaintiff's sedimentation rate to be 8 mm/hour (Tr. 231) and 6 mm/hour. (Tr. 234). Dr. Compain also noted in his November 8, 2004 letter that plaintiff's rheumatoid arthritis factor had been negative, but opined in the same letter that plaintiff suffered from rheumatoid arthritis. (Tr. 103). The labs he submitted, dated October 22, 2004, also indicated that plaintiff's Rheumatoid factor was 29.2 IU/ml, far above the normal range of 0.0 to 13.9 IU/ml. (Tr. 238). Furthermore, while Drs. Compain and Projansky both opined about numerous nonexertional limitations that would affect plaintiff's ability to work (for example, the need to avoid noise and temperature extremes) (Tr. 219, 302), Dr. Gaito opined that plaintiff had no such limitations. (Tr. 294). Given these inconsistent findings and opinions, it cannot be said that the evidence of record so clearly points to a physically disabling condition as to justify a remand solely for the calculation of benefits, as the plaintiff suggests. See, e.g., Halloran, 362 F.3d at 32; Snell, 177 F.3d at 133.

A remand is particularly appropriate in this case because it would also allow the ALJ to re-weigh the evidence from treating

sources, specify "good reasons" for discounting their opinions if he chooses to do so, re-weigh plaintiff's credibility, and more fully develop the record as may be needed. See Schaal, 134 F.3d at 506; Villani, 2008 WL 2001879, *11. Toward this end, "if necessary, the ALJ may also arrange for a medical advisor to assist him in evaluating the medical evidence, and a vocational expert to assist him in evaluating [plaintiff's] occupational base..." Pabon v. Barnhart, 273 F. Supp. 2d 506, 517 (S.D.N.Y. 2003); see also Butts, 388 F.3d at 387 (where a remand was appropriate because the ALJ failed to call a vocational expert, and thus, the record is incomplete and "further findings" are appropriate "to assure the proper disposition of [the] claim.").

## CONCLUSION

For the reasons noted, we recommend that plaintiff's motion be granted in part, that the Commissioner's motion be denied, and that this case be remanded to the Commissioner for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable

Loretta A. Preska, Room 1320, 500 Pearl Street, New York, New York 10007-1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'q denied, 474 U.S. 1111 (1986); Small v. Sec'y of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
**August 5, 2008**

**Respectfully Submitted,**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been
mailed this date to:

Lewis Bart Insler, Esq.
Insler & Hermann, LLP
80 Grasslands Road
Suite 102
Elmford, NY 10523

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

Susan D. Baird, Esq.
Assistant United States Attorney
86 Chambers Street - Third Floor
New York, NY 10007